**NEW YORK STATE ASSOCIATION FOR RETARDED CHILDREN, INC., et al., Plaintiffs-Appellees,**

**v.**

**Hugh L. CAREY, Individually and as Governor of the State of New York, et al., Defendants-Appellants.**

**No. 484, Docket 82–7531.**

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1982.

Decided June 15, 1983.

Frederick K. Mehlman, Asst. Atty. Gen., New York City (George D. Zuckerman, Asst. Sol. Gen., Frederic L. Lieberman, Asst. Atty. Gen., New York City, on the brief), for defendants-appellants.

John E. Kirklin, New York City (Archibald R. Murray, Kalman Finkel, The Legal Aid Soc., Christopher A. Hansen, N.Y. Civil

Liberties Union, New York City, on the brief), for plaintiffs-appellees.

Before FRIENDLY and NEWMAN, Circuit Judges, and WYZANSKI, District Judge.*

NEWMAN, Circuit Judge:

The "American Rule" that each party to a lawsuit bears its own attorney's fees has been substantially modified by some 120 Congressional enactments that permit a prevailing party in specified types of litigation to recover attorney's fees from its adversary. In 1976, Congress added a new provision that authorizes fees to prevailing parties in civil rights cases. Civil Rights Attorney's Fees Awards Act of 1976, Pub.L. No. 94-559, 90 Stat. 2641 (codified at 42 U.S.C. § 1988 (Supp. IV 1980)). This provision, which has proved to be the most frequently used of all the fee-shifting enactments, provides that the fee to be recovered shall be a "reasonable" one, without affording further guidance as to how the fee award should be calculated. Inevitably the generality of such a standard has precipitated a variety of disputes concerning the correctness of a fee calculation. Several of those disputes are presented by this appeal, which arises in the context of a fee award claimed by two non-profit organizations, the Legal Aid Society of New York City and the New York Civil Liberties Union, for services rendered by attorneys in their employ.

█ The appeal arises out of litigation conducted during the last ten years on behalf of a class of mentally retarded persons confined at the Willowbrook Developmental Center. Defendants-appellants are the Governor of the State of New York and various state officials with responsibilities for the care of the mentally retarded, collectively referred to hereinafter as the State. The litigation, brought pursuant to 42 U.S.C. § 1983 (Supp. IV 1980), resulted in the entry of a consent decree and elaborate subsequent proceedings challenging compliance with the decree. On June 15, 1982, the District Court for the Eastern District of New York (John R. Bartels, Judge) awarded plaintiffs attorney's fees and costs of $1,406,751.39. 544 F.Supp. 330 (E.D.N.Y.1982). Although this litigation evolved into a prolonged contest raising complex legal issues, we nevertheless believe that the District Court's fee award was excessive and unreasonable. As we have warned in the past, attorney's fees are to be awarded "with an 'eye to moderation,' seeking to avoid either the reality or the appearance of awarding 'windfall fees.'" *Beazer v. New York City Transit Authority,* 558 F.2d 97, 101 (2d Cir.1977) (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 469-70 (2d Cir.1974) (*Grinnell I*)), *rev'd on other grounds,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). Because we conclude that the fees awarded in this case constitute a substantial windfall for plaintiffs' attorneys, we reverse the District Court's order and remand the matter for further proceedings. We have also concluded that this appeal affords an appropriate occasion for providing trial courts with additional guidance in calculating attorney's fee awards.

### I.

### Factual Background and District Court Decision

Representatives of the Willowbrook class filed this suit in March 1972, alleging constitutional violations in the conditions at the Willowbrook Developmental Center and requesting injunctive relief. After the District Court granted the plaintiffs' motion for a preliminary injunction in April 1973 but before a final ruling on the merits of the case, the parties negotiated a settlement of their dispute. On April 30, 1975, the Court signed a consent decree that included a 29-page appendix of "Steps, Standards, and Procedures" for improving the conditions at the Willowbrook facility and gradually placing all but the most severely handicapped members of the Willowbrook class in smaller community facilities. *See*

---

* The Honorable Charles Edward Wyzanski, Jr. of the United States District Court for the District of Massachusetts, sitting by designation.

*New York State Association for Retarded Children, Inc. v. Carey,* 393 F.Supp. 715 (E.D.N.Y.1975).

The consent decree did not end the case. As the District Court recognized when it approved the settlement, further judicial orders would be "necessary or appropriate for the construction of, implementation of, or enforcement of compliance" with the consent decree. For these purposes, the Court retained jurisdiction over the case. Since 1975, both sides of this litigation have regularly invoked this jurisdiction to return to the District Court for guidance in interpreting the consent decree, and plaintiffs have sought relief from alleged violations of the settlement agreement.[1]

In addition to retaining jurisdiction, the District Court, in its April 30, 1975, order, reserved the question whether the plaintiffs' attorneys should be awarded attorney's fees and costs. At the time of this reservation, the common-law authority of federal courts to award attorney's fees in such cases was in question. Two weeks after the consent decree was signed, however, the Supreme Court resolved the issue by ruling, with exceptions not pertinent to this case, that federal courts could not award attorney's fees absent explicit statutory authorization. *See Alyeska Pipeline Service Co. v. The Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 14 (1975). At the time, there was no statute authorizing the award of fees in section 1983 suits.

The next year, however, Congress passed the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (Supp. IV 1980), granting courts the discretion to award prevailing parties in section 1983 litigation "a reasonable attorney's fee as part of the costs." Plaintiffs' attorneys then applied to the District Court for attorney's fees under section 1988. On March 22, 1978, the District Court concluded that section 1988 could be applied to prevailing parties whose cases were pending on October 19, 1976, the effective date of section 1988. Finding the litigation pending on that date, the District Court ruled on March 22, 1978, that plaintiffs were entitled to attorney's fees under section 1988.

■ Two and a half years later the plaintiffs filed a detailed application for reimbursement. In requesting attorney's fees, plaintiffs conformed to the "lodestar" approach, endorsed by this Circuit in the *Grinnell* opinions. *See City of Detroit v. Grinnell Corp.,* 560 F.2d 1093 (2d Cir.1977) (*Grinnell II*); *Grinnell I, supra; accord Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir.1976) (en banc). Under the lodestar approach, attorney's fees are calculated by multiplying the number of billable hours that the prevailing party's attorneys spend on the case by "the hourly rate normally charged for similar work by attorneys of like skill in the area." *Grinnell II, supra,* 560 F.2d at 1098. After calculating a base fee from these relatively objective considerations, the District Court then has discretion to adjust the fee award in light of more subjective factors, such as the risk of the litigation, the complexity of the issues, and the skill of the attorneys. *Id.* Pursuing the lodestar approach, plaintiffs' application claimed 16,410 hours of attorneys' and law students' time,[2] at rates ranging up

---

1. Our most recent encounter with the Willowbrook litigation involved the plaintiffs' efforts to secure compliance with the consent decree and the defendants' efforts to modify it. *New York State Association for Retarded Children, Inc. v. Carey,* 706 F.2d 956 (2d Cir.1983). Clar-

ity might be enhanced if that decision is referred to as the "consent decree" case, and this one as the "fee award" case. A partial list of prior reported decisions dealing with the Willowbrook litigation appears in the District Court opinion. 544 F.Supp. at 333 n. 2.

2.

Table 1

Hours Claimed by Plaintiffs' Attorneys
(figures may not sum due to rounding)

| Attorney | Before 12/73 | 1/74 to 12/75 | 1/76 to 12/77 | 1/78 to 4/80 | Fee Application | Total |
|---|---|---|---|---|---|---|
| Bruce Ennis | 1098 | 1185 | 293 | 19 | -- | 2595 |
| Christopher Hansen | 30 | 813 | 569 | 610 | 63 | 2085 |

to $140 an hour, for a base fee of $1,312,642, plus a bonus of $1,208,753. The total award sought was $2,542,430, which included a claim for traditional taxable costs of $21,035.

The plaintiffs' application for attorney's fees sparked a new round of litigation, focusing primarily on the question whether the plaintiffs' attorneys had, in fact, spent 16,410 billable hours on the Willowbrook litigation. While the plaintiffs submitted substantial documentation, contemporaneous time records were included for only a small fraction of the total hours claimed. The plaintiffs' attorneys estimated the majority of their time by reconstruction. The District Court explained the reconstruction process as follows:

> Five of the attorneys have used a list of contemporaneous documents ("Greenbook") to help them more accurately approximate part of the time claimed. In addition, the eight lawyers and two law students have submitted affidavits summarizing hours expended and have answered interrogatories . . . .
>
> There is a wide range in the quality of the applications in terms of specificity, but all are wanting to a degree. The attorneys' reconstruction of time is based on present recollection of hours spent years before, in some instances as many as eight years ago. Although five attorneys used a list of documents to refresh their recollection, only one of the attorneys consistently reexamined the documents, and all estimated at least a portion of their time without reference to a supporting document list.

544 F.Supp. at 338.

Unsatisfied with the reconstruction efforts of the plaintiffs' attorneys, the State of New York opposed the plaintiffs' motion for attorney's fees. The State submitted an extensive memorandum and included a detailed appendix responding to each of the hourly estimates claimed by the plaintiffs' attorneys as time spent on the more than 3,000 documents included in the "Greenbook." The State argued that the plaintiffs' reconstructions were duplicative and excessive. By its own calculations, the State reasoned that the plaintiffs' lawyers had expended only 3,353 compensable hours, rather than the 16,410 hours claimed. Moreover, the State argued that the hourly rate of compensation requested by the plaintiffs for their attorneys was too high, and that a bonus for plaintiffs' attorneys was inappropriate. The State concluded that the plaintiffs were entitled, at most, to only $167,813 in attorney's fees.

The District Court considered the plaintiffs' application and the defendants' opposition in a memorandum decision filed on June 15, 1982. 544 F.Supp. 330 (E.D.N.Y. 1982). In that opinion, the Court criticized the plaintiffs' attorneys for failing to keep contemporaneous time records, and noted that this failure was particularly inexcusable after the March 22, 1978, ruling, once it was clear that attorney's fees were to be awarded in this case. However, notwithstanding plaintiffs' inadequate documentation, the District Court accepted the application and proceeded to determine how

Hours Claimed by Plaintiffs' Attorneys
(figures may not sum due to rounding)

| Attorney | Before 12/73 | 1/74 to 12/75 | 1/76 to 12/77 | 1/78 to 4/80 | Fee Application | Total |
|---|---|---|---|---|---|---|
| John Kirklin | 915 | 92 | 16 | 11 | 150 | 1184 |
| Robert Feldt | 530 | | | | | 530 |
| Kalman Finkel | 125 | | | | 10 | 135 |
| Anita Barrett | 2912 | 2277 | 906 | | 55 | 6150 |
| Douglas Leonard | | 700 | | | | 700 |
| Carol Kellermann | | | 491 | 491 | 3 | 611 |
| Law Students | | | | | | 2420 |
| OVERALL TOTAL | | | | | | 16,410 |

much of the time claimed was compensable under section 1988. Although Judge Bartels believed that "counsel have generally attempted to be conservative in their reconstruction of hours," *id.* at 339, he also concluded that the application for fees was inaccurate in some respects and included instances of excess and duplication. The District Court, therefore, disallowed a significant number of the hours claimed by the plaintiffs. These disallowances can be divided into four groups. First, the District Court disallowed all 2,420 hours claimed for work done by two law students. The only support for this portion of the application was the general recollections of the law students themselves. Their affidavits and responses to interrogatories gave only cursory accounts of the manner in which these hours were expended. Judge Bartels could not determine which of the law students' hours were compensable under section 1988 as legal services and which represented educational activities of little or no value to the plaintiff class; he decided that any ambiguities arising out of poor records should be resolved against the applicant, *see EEOC v. Sage Realty Corp.*, 521 F.Supp. 263, 273–74 (S.D.N.Y.1981), and therefore disallowed fees for any of the law students' time.

Second, the District Court disallowed the majority of hours claimed by the three attorneys who participated in only the early stages of the litigation and whose applications suffered from a particularly serious lack of specificity. Robert Feldt, Kalman Finkel, and Douglas Leonard together reported 1,365 hours of work, all but ten hours done before December 31, 1975. Unwilling to accept an estimate of attorneys' time which is "almost entirely unsupported by daily records," *In re Hudson & Manhattan Railroad Co.*, 339 F.2d 114, 115 (2d Cir.1964), Judge Bartels chose to make his own conservative calculations of how much time these three attorneys should be allowed, and concluded that their combined efforts justified an allowance of 271 hours. By recalculating the hours of these three attorneys, the District Court reduced the requested hours by 1,094 hours.

Third, the District Court considered the applications of the five attorneys principal-

ly responsible for representing the Willowbrook class: Bruce Ennis, Christopher Hansen, John Kirklin, Anita Barrett, and Carol Kellermann. Together, these five had reported 12,625 hours of time spent on the Willowbrook litigation. Prompted by objections raised in the defendants' motion in opposition, the District Court disallowed a small number of their hours as not compensable. These small reductions, comprising 141 hours, eliminated time spent by the attorneys on internecine disputes, time spent working on related litigation, and excessive time spent on preparing the application for fees.

Finally, the District Court considered defendants' more general complaint that the plaintiffs' application contained numerous excessive or duplicative entries. Rather than assess separately each objection raised by the defendants, Judge Bartels chose to acknowledge the general force of the defendants' attack and to make percentage reductions in the hours allowed for each of the principal attorneys. These percentage reductions ranged from five percent to twenty percent of the hours requested (after subtracting the specific hour reductions mentioned above). In determining the appropriate percentages, the Court considered duplicative claims, excessive claims for certain tasks, inadequate detail in documentation, and inconsistencies between the amount of time claimed by different attorneys for similar or identical tasks. The District Court's percentage cuts for the five lead attorneys eliminated another 1,722 hours of attorney time.

In the aggregate, the District Court eliminated 5,377 hours of the 16,410 hours claimed by plaintiffs, a reduction of close to one-third.

Having determined the number of compensable hours, the District Court had then to fix the appropriate hourly rate of compensation in order to calculate the lodestar figure under *Grinnell*. On this matter, the District Court accepted the rates proposed in the plaintiffs' application. Those rates were based primarily on the billing rates charged for associates' time by the New York City law firm of Cravath, Swaine &

Moore (Cravath), one of whose partners was a director of the Legal Aid Society and testified on the fee application. The Court's compensation schedule, which we will discuss subsequently, set a minimum rate of $70 per hour for work done by attorneys with less than two years of experience and a maximum of $140 per hour for attorneys with more than thirteen years of experience. Though conceding that these rates were "somewhat high in comparison to fees awarded counsel in local civil rights cases," Judge Bartels believed that they were not excessive. 544 F.Supp. at 337. Moreover, he noted that the legislative history of the Civil Rights Attorney's Fees Awards Act required that section 1988 awards "be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature." S.Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976) [hereinafter cited as *Senate Report*], *reprinted in* 1976 U.S.Code Cong. & Ad. News 5908, 5913. The District Court concluded that, since the plaintiffs' attorneys were of comparable skill to the Wall Street lawyers working for Cravath, the proposed compensation schedule was appropriate because it reflected "fees that would be charged for similar work by attorneys of like skill in the area." *Cohen v. West Haven Board of Police Commissioners*, 638 F.2d 496, 506 (2d Cir.1980).

The District Court then applied the schedule of rates to the compensable hours. Taking into account the amount of experience of each attorney at the various stages of the litigation, the Court compensated the attorneys who participated in the entire litigation at higher rates for work done in later years of the case, as they gained more experience. The District Court's calculation, detailed in the margin,[3] produced a

**3.**

Table 2
Hours and Fees Awarded by District Court*
(figures may not sum due to rounding)

| Attorney | Period | Hours Allowed | Rate of Compensation | Total |
|---|---|---|---|---|
| Ennis | Before 12/73 | 1040 | $110 | |
| | 1/74 to 12/75 | 1120 | 120 | |
| | 1/76 to 12/77 | 264 | 135 | |
| | 1/78 to 4/80 | 4 | 140 | |
| | Fee Application | 29 | 140 | |
| | Administrative | 6 | 50 | |
| | TOTAL | 2463 | $117 (average) | $289,406 |
| Hansen | Before 12/73 | 28 | $ 70 | |
| | 1/74 to 12/75 | 720 | 75 | |
| | 1/76 to 12/77 | 490 | 85 | |
| | 1/78 to 4/80 | 474 | 100 | |
| | Fee Application | 122 | 100 | |
| | Administrative | 17 | 50 | |
| | TOTAL | 1851 | $ 85 (average) | 158,018 |
| Kirklin | Before 12/73 | 823 | $ 75 | |
| | 1/74 to 12/75 | 81 | 85 | |
| | 1/76 to 12/77 | 4 | 105 | |
| | 1/78 to 4/80 | 9 | 115 | |
| | Fee Application | 119 | 115 | |
| | TOTAL | 1036 | $ 81 (average) | 83,664 |
| Barrett | Before 12/73 | 2329 | $ 70 | |
| | 1/74 to 12/75 | 1811 | 80 | |
| | 1/76 to 12/77 | 711 | 95 | |

lodestar figure of $978,052 for the 11,034 allowable hours. The average rate per hour was $88.64.

After determining the lodestar figure, the District Court concluded that a bonus would also be appropriate in this case. The Willowbrook litigation, the Court noted, had been a pathbreaking piece of institutional reform, whose success was very much in doubt at the start. Moreover, plaintiffs' attorneys' representation had been outstanding, and they had achieved impressive results for the plaintiff class. The Court therefore decided that the plaintiffs' attorneys should receive a fifty percent bonus for work done before the consent decree was signed, and a twenty-five percent bonus for work done after that date, by which time the success of the litigation was largely assured. No bonus, however, was added to time spent on the attorney's fees application. The total addition to the lodestar figure was a $411,864 bonus. On top of this

was added $16,835 for allowable traditional costs, making the total award $1,406,751.

## II.
### Applicability of Section 1988

■ As a threshold matter, the defendants challenge the District Court's March 22, 1978, order, which ruled that section 1988 applied to the plaintiffs' application for fees. The legislative history of the Civil Rights Attorney's Fees Awards Act establishes that Congress intended section 1988 to apply to "all cases pending on the date of enactment." H.Rep. No. 1558, 94th Cong., 2d Sess. 4 n. 6 (1976) [hereinafter cited as *House Report*], *reprinted in* E. Larson, *Federal Court Awards of Attorney's Fees* 288, 291 n. 6 (1981); *accord Senate Report, supra,* at 5, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 5912. But defendants contend that the District Court erred in concluding that this case was pending on October 19, 1976, the date of enactment.[4] We reject the defendants' contention.

| Attorney | Period | Hours Allowed | Rate of Compensation | Total |
|---|---|---|---|---|
| | Fee Application | 46 | 110 | |
| | Administrative | 8 | 50 | |
| | TOTAL | 4904 | $ 78 (average) | 380,889 |
| Kellermann | 1/76 to 12/77 | 91 | $ 80 | |
| | 1/78 to 4/80 | 416 | 80 | |
| | Fee Application | 3 | 80 | |
| | TOTAL | 509 | $ 80 (average) | 40,715 |
| Feldt | Before 12/73 | 71 | $120 | 8,520 |
| Finkel | Before 12/73 | 38 | $120 | |
| | Fee Application | 2 | 140 | |
| | TOTAL | 40 | $121 (average) | 4,840 |
| Leonard | 1/74 to 12/75 | 160 | $ 75 | 12,000 |
| | GRAND TOTAL | 11,034 | $ 89 (average) | $978,052 |

*The information presented in this table is in a slightly different form than the one used by the District Court. *See* 544 F.Supp. at 344–45. In the District Court's table, the column "Hours Approved" referred to hours approved before the percentage cuts were made. In our table, "Hours Allowed" incorporates the percentage cuts.

---

4. Defendants argued before the District Court and assert on appeal that, when the parties signed the consent decree with its reservation of the attorney's fees issue, they had reached an understanding that the matter would be governed by the soon-to-be decided case of *Alyeska Pipeline Service Co. v. The Wilderness Society, supra.* The District Court rejected defendants' argument that the parties had a private agreement on this matter, and nothing in the record leads us to believe that the District Court erred in its determination. Accordingly, we conclude that the District Court was correct in looking solely to section 1988 and applicable case law to determine whether plaintiffs were entitled to attorney's fees.

In stating that section 1988 applies to pending cases, both congressional reports indicated that section 1988 should be applied according to the rule enunciated by the Supreme Court in *Bradley v. School Board,* 416 U.S. 696, 716–21, 94 S.Ct. 2006, 2018–21, 40 L.Ed.2d 476 (1974). Though ruling on an award of attorney's fees under section 718 of the Education Amendments of 1972, 20 U.S.C. § 1617 (1976), *Bradley* involved legal issues of striking relevance to this case. Before section 718 was enacted, the *Bradley* plaintiffs had obtained a final order in a school desegregation case, and had been awarded attorney's fees by the trial court. While the state defendants were appealing the award of attorney's fees, section 718 became law. The question before the Supreme Court in *Bradley* was whether section 718 should be applied to a case in which the only matter pending at the time of enactment was an appeal from the award of attorney's fees. 416 U.S. at 710, 94 S.Ct. at 2015. The Supreme Court ruled that section 718 should apply under the principle that a court should generally apply the law in effect at the time that it renders its decision. *See id.* at 711–16, 94 S.Ct. at 2016–18.

■ By explicitly endorsing the *Bradley* rule, Congress made clear that it expected section 1988 to apply to all attorney's fee awards considered after October 19, 1976. *Accord Robinson v. Kimbrough,* 652 F.2d 458, 464 (5th Cir.1981); *David v. Travisono,* 621 F.2d 464, 466–68 (1st Cir.1980); *Northcross v. Board of Education,* 611 F.2d 624, 633–34 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980). Since the District Court considered the plaintiffs' application in 1978, it was correct in ruling that the case should be decided under section 1988.

Defendants contend that the only reason the District Court considered the plaintiffs' motion for attorney's fees after the enactment of section 1988 was that plaintiffs intentionally delayed submitting their motion out of a realization that the motion would be useless, under the *Alyeska* deci-

sion, without express statutory authorization. We acknowledge that it might be inappropriate to apply section 1988 to a request for attorney's fees arising out of an action resolved long before 1976 or a matter that had been dormant for many years, but reopened since 1976 only for modification or enforcement, *see, e.g., Wheeler v. Durham City Board of Education,* 585 F.2d 618, 621–23 (4th Cir.1978). There was, however, no impropriety in applying section 1988 to this case. Although plaintiffs delayed more than two years in moving for attorney's fees, that delay was not simply a result of fear that fees might be denied. As the application for attorney's fees shows, plaintiffs' attorneys continued to spend considerable time on the litigation after the consent decree was signed. Inasmuch as any application for attorney's fees would have been incomplete until the pace of litigation slowed, the plaintiffs were surely justified in withholding their motion for attorney's fees until 1978. *Cf. Northcross v. Board of Education, supra,* 611 F.2d at 635 ("The prejudice [from the delay in seeking fees], if any, has inured to the plaintiffs' attorneys who have provided years of service without compensation in hand.").

We also agree with the District Court that the volume of litigation that surrounded the enforcement of the consent decree, coupled with the fact that the District Court retained jurisdiction to issue further orders, provides an independent ground for concluding that the matter was pending well after October 9, 1976, even without regard to the subsequent motion for attorney's fees. *See Bolden v. Pennsylvania State Police,* 491 F.Supp. 958, 961 (E.D.Pa. 1980).

### III.

#### Determination of Allowable Hours

Notwithstanding the 5,377 hours that the District Court cut from plaintiffs' amended application, defendants contend that the Court nevertheless awarded fees for too many hours of time. To support this con-

tention, the State points to numerous entries in plaintiffs' fee application that were either excessive or duplicative. These examples primarily involve plaintiffs' five lead attorneys—Ennis, Hansen, Kirklin, Kellermann, and, most of all, Barrett. While the State's illustrations establish that plaintiffs' application contained multiple errors and excesses, the State has not persuaded us that the District Court was in error in its calculation of allowable hours.

In ruling on the fee application, the District Court dealt with plaintiffs' five lead attorneys principally through individual percentage cuts, ranging from five percent to twenty percent. Judge Bartels was acting within his discretion when he chose to make percentage reductions in response to defendants' detailed claims that the fee application contained excessive and duplicative hours. In similar cases with voluminous fee applications, courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application. *See Copeland v. Marshall,* 641 F.2d 880, 903 (D.C.Cir.1980) (en banc) (22% cut); *Ross v. Saltmarsh,* 521 F.Supp. 753, 761–62 (S.D.N.Y.1981) (5% and 10% cuts), *aff'd mem.,* 688 F.2d 816 (2nd Cir. 1982); *Kane v. Martin Paint Stores, Inc.,* 439 F.Supp. 1054, 1056 (S.D.N.Y.1977) (10% cut), *aff'd mem.,* 578 F.2d 1368 (2d Cir. 1978). These courts have endorsed percentage cuts as a practical means of trimming fat from a fee application.

Nor do we find any reason for quarreling with the percentages selected by the District Court. We note that the specific instances of excessive or duplicative entries alleged by defendants on this appeal place in doubt between 1,500 and 2,000 of the hours claimed by the five lead attorneys and that the percentage reductions made by the District Court eliminated more than 1,700 of the hours requested by these attorneys. Furthermore, the attorney with whose application defendants find most fault—Barrett—was also the attorney

against whom the District Court assessed the largest across-the-board cut—twenty percent. To a large degree, Judge Bartels appears to have accepted the defendants' assessment of the plaintiffs' application.

On a more general level, the State complains that Judge Bartels should have made further reductions in his award because plaintiffs' attorneys overstaffed the litigation and sought fees for time spent on background research. The District Judge refused to disallow these hours, and ruled that plaintiffs' use of multiple counsel was appropriate in light of the complexity of the litigation and that plaintiffs' background research was essential to their success.[5]

In assessing the extent of staffing and background research appropriate for a given case, a district court must be accorded ample discretion. Under section 1988, prevailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions or an extra lawyer into court to observe and assist. *See Seigal v. Merrick,* 619 F.2d 160, 164 (2d Cir.1980). Nor are counsel forbidden from receiving fees for background research. *See Ross v. Saltmarsh, supra,* 521 F.Supp. at 757–59. Of course, a trial judge may decline to compensate hours spent by collaborating lawyers or may limit the hours allowed for specific tasks, but for the most part such decisions are best made by the district court on the basis of its own assessment of what is appropriate for the scope and complexity of the particular litigation. A district court's determinations on such matters will be overturned on appeal only when it is apparent that the size of the award is out of line with the degree of effort reasonably needed to prevail in the litigation.

In this case, the District Court allowed plaintiffs compensation for 11,034 hours of legal work, which is roughly equivalent to five and a half years of work by a

---

**5.** The background research performed by plaintiffs' attorneys for this litigation was not of the sort needed to raise these attorneys to a level of competence shared by many experienced practitioners within an established field of specialization, which may well not be compensable, but was warranted rather to assist in establishing a new branch of specialization, one in which only a handful of attorneys had preceded them.

single attorney. Given the complexity of the Willowbrook litigation and the number of years the suit has gone on, we do not believe that the number of hours allowed by the District Court was disproportionate. Nor do we believe that the award of five and a half years of attorney time supports defendants' claim that plaintiffs over-staffed or overresearched this case. While the defendants have shown that the plaintiffs' fee application contained serious shortcomings, the District Court adequately responded to those shortcomings with its percentage cuts from requested hours.

In reviewing the District Court's ruling on allowable hours, our task in assessing the State's objections has been complicated by plaintiffs' failure to maintain contemporaneous records. It is hard to weigh claims of overstaffing and duplication against the plaintiffs' estimates of hours expended. Without a detailed record of how plaintiffs' attorneys spent their time, we have little choice but to show considerable deference to the District Court's conclusion as to how many hours were reasonably compensable. In light of the difficulties that can be traced to the failure of plaintiffs' attorneys to keep contemporaneous time records, we are tempted to accept the State's proposal that plaintiffs be denied all attorney's fees. There is no excuse for the sparse documentation that accompanied at least portions of plaintiffs' original application for attorney's fees. Well before the Willowbrook litigation began, this Circuit announced that "any attorney who hopes to obtain an allowance from the court should keep accurate and current records of work done and time spent." *In re Hudson & Manhattan Railroad Co., supra,* 339 F.2d at 115; *see In re Wal-Feld Co.,* 345 F.2d 676 (2d Cir.1965). The record shows that the plaintiffs were hoping to receive court-ordered attorney's fees as early as 1975 when they negotiated the consent decree and reserved the right to apply for attorney's fees. At the very least, plaintiffs' attorneys knew they would be seeking fees after March 22, 1978, when the District Court ruled that they were eligible for attorney's fees under section 1988.

We recognize, however, that it might be unfair in this case to deny plaintiffs all attorney's fees simply because they failed to maintain contemporaneous records throughout the litigation. Dicta in *Grinnell II* may have led plaintiffs to believe that fees would be awarded as long as hours expended were estimated by "careful reconstruction." 560 F.2d at 1103. Moreover, it is possible that plaintiffs' attorneys, in failing to keep better records, relied on language in the decisions of other circuits, which suggests that non-profit law offices are not required to keep the same sort of records that would be expected of private practitioners primarily engaged in rendering services for fee-paying clients. *See, e.g., Harkless v. Sweeny Independent School District,* 608 F.2d 594, 597 (5th Cir. 1979).

However unfair it would be to rule retroactively that plaintiffs' attorneys should have kept better records in the past, the difficulties raised by the lack of contemporaneous records in this case convince us of the need to announce for the future that contemporaneous time records are a prerequisite for attorney's fees in this Circuit. *See Hensley v. Eckerhart,* —— U.S. —— ——, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983) (Burger, C.J., concurring). Now that Congress has enacted more than 120 statutes authorizing the award of attorney's fees, *see Attorney's Fee Awards Reporter,* Oct. 1982, at 2–3, and litigation over attorney's fees has itself become a significant addition to the legal landscape, *see generally id.,*[6] we think it appropriate to convert our previously expressed preference for contemporaneous time records, *McCann v. Coughlin,* 698 F.2d 112, 131 (2d Cir.1983); *In re Hudson & Manhattan R.R. Co.,* 339 F.2d 114, 115 (2d Cir.1964), into a mandatory requirement, as other Circuits have done, *see National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1327 (D.C.Cir.1982); 5th Cir.R. 22.2, *reprinted in* 693 F.2d No. 3, at lxxiii (Jan. 10, 1983); *see also* E. Larson, *supra,* at 281 (recommend-

---

**6.** The headnotes to section 1988, most of which concern attorney's fee disputes, now fill 150 pages of West's annotations. *See* 42 U.S.C.A. § 1988, at 155–305 (West 1981).

ing that all litigating attorneys keep daily time records); *cf.* A. Miller, *Attorneys' Fees in Class Actions* 344–45 (Federal Judicial Center 1980) (recommending trial court require time sheets at pretrial conference). Hereafter, any attorney—whether a private practitioner or an employee of a nonprofit law office—who applies for court-ordered compensation in this Circuit for work done after the date of this opinion must document the application with contemporaneous time records. These records should specify, for each attorney, the date, the hours expended, and the nature of the work done.

 Although we do not believe that plaintiffs in this case should be denied attorney's fees for failing to keep contemporaneous records, we think the omission precludes an award of attorney's fees for time spent preparing and litigating the fee application. The District Court allowed 322 hours of attorney time spent on the fee application, time valued at $35,626. In the ordinary course, prevailing parties are entitled to fees for preparing an application under section 1988, *see Gagne v. Maher,* 594 F.2d 336, 344 (2d Cir.1979), *aff'd on other grounds,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). In this case, however, such an award is not appropriate. The inordinate amount of time plaintiffs' attorneys spent on the fee application was a direct result of their failure to keep better records. Because there were no contemporaneous time records, plaintiffs' attorneys, as well as defense counsel, had to spend numerous hours reviewing documents and preparing affidavits in support of their application. Had plaintiffs kept better records, both parties would have had a simpler time litigating the application for attorney's fees. Accordingly, we conclude that it was unreasonable for the District Court to grant plaintiffs' attorney's fees for 322

hours spent in connection with the fee application itself. *See Lund v. Affleck,* 587 F.2d 75, 77 (1st Cir.1978).

In summary, as to the number of compensable hours, we accept the District Court's determination of the number of compensable hours that plaintiffs' attorneys spent on the substantive portions of the litigation, but reject the Court's allowance of any time spent on the fee application.

## IV.

### Determination of Hourly Rate

The most perplexing aspect of this appeal concerns the appropriate rate of hourly compensation. At plaintiffs' suggestion, the District Court adopted a schedule of compensation, ranging from $70 to $140 per hour, based primarily on the rates at which the Cravath firm billed for the time of its associates in 1980. Starting with the range of Cravath hourly rates of $65 to $105 for associates with from one to eight years' experience,[7] the District Court accepted the plaintiffs' extrapolation of the top of the range to $140 for attorneys with more than thirteen years' experience and set $70 as the minimum rate for attorneys with less than two years' experience. The District Court's decision to base the fee award on Cravath's 1980 billing rates presents us with two distinct issues: first, whether it is appropriate to compensate attorneys from non-profit law offices with fees based on the billing rates of a large Wall Street law firm, and second, whether fee awards should be based on current rates or historical rates prevailing in prior years when the legal services were rendered.

 A. *An Appropriate Rate.* While there is no doubt that non-profit organizations are entitled to fees under section 1988,[8] there is less certainty over the man-

---

7. The record contains a letter from John R. Hupper, a Cravath partner, reporting the following billing rates for the firm's associates:

| Year | Range of Billing Rates Based on One to Eight Years' Experience |
|------|------|
| 1972 | $26–$ 40 |
| 1973 | 29– 55 |
| 1974 | 32– 65 |
| 1975 | 35– 65 |

| Year | Range of Billing Rates Based on One to Eight Years' Experience |
|------|------|
| 1976 | $40–$ 75 |
| 1977 | 50– 80 |
| 1978 | 60– 95 |
| 1979 | 65– 100 |
| 1980 | 65– 105 |

8. The legislative history of section 1988 makes clear that prevailing parties should not be de-

ner by which a rate should be determined. The legislative history does not expressly discuss the rate of compensation appropriate for non-profit lawyers. Some clues in the legislative history point in opposite directions. The Senate Report indicates that the amount of fee awards in civil rights cases should be governed by "the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases," *Senate Report, supra,* at 6, *reprinted in* 1976 U.S.Code Cong. & Ad. News at 5913. However, this recognition of equivalence between civil rights cases and other complex cases does not necessarily imply equivalent fees for profit-making and non-profit attorneys. The Senate Report cites *Davis v. County of Los Angeles, supra,* which declined to reduce a fee award because non-profit attorneys were involved, yet also cites *Swann v. Charlotte-Mecklenburg Board of Education, supra,* in which the District Court acknowledged that the fee awarded to a prevailing plaintiff represented by a non-profit firm was lower than that charged by defendant's private counsel for similar services that were not even successful, 66 F.R.D. at 486. Both congressional reports caution against fee awards that "produce windfalls to attorneys." *Senate Report, supra,* at 6, *reprinted in* 1976 U.S. Code Cong. & Ad.News at 5913; *see House Report, supra,* at 9, *reprinted in* E. Larson, *supra,* at 298. *See also Hensley v. Eckerhart, supra,* —— U.S. at ——, 103 S.Ct. at

1945 (Brennan, J., concurring in part and dissenting in part) (remand appropriate to avoid "an unmistakable windfall").

Most courts have ruled that fee awards in civil rights cases should not be reduced when prevailing plaintiffs are represented by a non-profit law office, *e.g., Oldham v. Ehrlich,* 617 F.2d 163, 168–69 (8th Cir.1980); *Palmigiano v. Garrahy,* 616 F.2d 598, 601–02 (1st Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980); *Rodriguez v. Taylor, supra,* 569 F.2d at 1248–49, and have refused to make reductions based on low overhead costs, *Mary and Crystal v. Ramsden,* 635 F.2d 590, 601–02 (7th Cir. 1980), low salaries, *Mid-Hudson Legal Services v. G & U, Inc.,* 465 F.Supp. 261, 270 (S.D.N.Y.1978), or reimbursement of the office's budget by government funding, *Dennis v. Chang,* 611 F.2d 1302, 1304–07 (9th Cir.1980). Some courts have acknowledged that fee awards to non-profit attorneys based on market rates for private attorneys result in overcompensation, but have declined to abandon market rates because the extra money will serve the beneficial purpose of expanding the availability of free legal services. *See Oldham v. Ehrlich, supra,* 617 F.2d at 168–69; *Palmigiano v. Garrahy, supra,* 616 F.2d at 602.

Our own precedents have not been entirely consistent. We have expressed the view that reduction from market rates of private attorneys is not appropriate, *Beazer v. New*

nied fee awards simply because their attorneys are not private law firms. The House Judiciary Committee reported that "a prevailing party is entitled to counsel fees even if represented by an organization," *House Report, supra,* at 9 n. 16, *reprinted in* E. Larson, *supra,* at 297 n. 16, and cited with approval *Torres v. Sachs,* 538 F.2d 10 (2d Cir.1976), in which this Circuit ruled that non-profit law offices were entitled to attorney's fees under the Voting Rights Act because "receipt of such fees promotes their continued existence and service to the public in this field," *id.* at 13. In addition, the Senate report referred with approval to cases in which fees were awarded to attorneys in non-profit law offices. *Senate Report, supra,* at 6, *reprinted in,* 1976 U.S.Code Cong. & Ad.News at 5913 (citing *Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444 (C.D.Cal.1974); *Swann v. Charlotte-Mecklenburg Board of Education,* 66 F.R.D. 483 (W.D.N.C.1975)); *see* E. Larson, *supra,* at 100–03.

Responsive to Congress' unambiguous intentions, courts have unanimously held that non-profit attorneys should not be denied fees under section 1988. *See Perez v. Rodriguez Bou,* 575 F.2d 21, 24 (1st Cir.1978); *Rodriguez v. Taylor,* 569 F.2d 1231, 1247–50 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); *see also Brandenburger v. Thompson,* 494 F.2d 885, 889 (9th Cir.1974) (award to ACLU under pre-*Alyeska* private attorney general theory). On several occasions, this Circuit has accepted the view that non-profit attorneys are entitled to fee awards. *See Holley v. Lavine,* 605 F.2d 638, 645–46 (2d Cir.1979), *cert. denied,* 446 U.S. 913, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980); *Mid-Hudson Legal Services v. G & U, Inc.,* 578 F.2d 34 (2d Cir. 1978); *see also Carey v. New York Gaslight Club, Inc.,* 598 F.2d 1253, 1255 n. 1 (2d Cir. 1979) (Title VII case), *aff'd,* 447 U.S. 54, 70 n. 9, 100 S.Ct. 2024, 2034 n. 9, 64 L.Ed.2d 723 (1980).

*York City Transit Authority, supra,* 558 F.2d at 100; *Torres v. Sachs, supra,* 538 F.2d at 13; *see also Carey v. New York Gaslight Club, Inc., supra,* 598 F.2d at 1255 n. 1, yet we have also approved reductions of fee awards to reflect the percentage of a non-profit law office's budget that is reimbursed by government funding, *Gagne v. Maher, supra,* 594 F.2d at 345; *EEOC v. Enterprise Association of Steamfitters Local No. 638,* 542 F.2d 579, 593 & n. 13 (2d Cir.1976), *cert. denied,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977), and we have also ruled that such reductions are not required, *Beazer v. New York City Transit Authority, supra,* 558 F.2d at 100. Now that the issue is forcefully brought before us by the allowance of an award in excess of a million dollars, computed on the basis of rates charged by a leading Wall Street firm, we think it is appropriate to explore the matter and provide the district courts with further guidance.

■ We begin by noticing that an award to non-profit lawyers based upon billing rates charged by profit-making lawyers inevitably produces a windfall. The billing rate for a profit-making law firm typically includes three components: the compensation of the billing attorney, a share of the firm's overhead, and some profit for the firm.[9] Obviously the profit component is a questionable ingredient in a "reasonable" fee for a non-profit law firm. In addition, the two remaining components of a private firm's billing rate would often reflect much higher expenses than those incurred by a non-profit office. Private firms in New York City usually pay their associates more than most attorneys earn in non-profit offices. Moreover, large private firms like Cravath incur overhead expenses far higher than those of non-profit firms. They pay premium rents, and they maintain the personnel and other resources necessary to provide the extensive legal services and quantity of documents required on short notice in connection with corporate and securities practices.

■ When the District Court reimbursed plaintiffs' attorneys at between $70 and $140 per hour, it was compensating their offices at a rate substantially higher than it cost those offices to support their attorneys on an hourly basis. Given the vast difference that undoubtedly separates Cravath's profit and costs from the costs of the New York Civil Liberties Union or the New York Legal Aid Society, we conclude that the District Court's use of Cravath rates to compensate these non-profit offices was so inordinately generous as to be unreasonable.[10] In so ruling we do not suggest that the public interest lawyers who represented the Willowbrook class in this case are in any way less skilled or dedicated than Cravath's lawyers. We have simply found that compensating these non-profit lawyers at Cravath rates would constitute a substantial windfall for the organizations involved. Windfalls are explicitly proscribed in the legislative history of section 1988, and we conclude that any award that includes such a large windfall must be considered unreasonable.

The "windfall" aspect of the fees that have been awarded could be eliminated by determining the cost that each non-profit law office incurred to provide an hour of time of the various attorneys. Presumably, this calculation would involve dividing the attorney's annual salary by his or her total

**9.** When the billing attorney is an associate of a firm, the hourly compensation is readily derivable from his or her salary. In the case of a partner, no distinction is ordinarily drawn between compensation and profit; so there is no occasion to identify separately the component of a partner's billing rate attributable solely to compensation. That circumstance does not eliminate profit as a component of a partner's billing rate, conceptually distinct from compensation. The distinction would have practical significance if the firm were a corporation and for some reason not entitled to be taxed under Subchapter S. *See* I.R.C. §§ 1371–1379 (1983). In that event, any portion of billing revenue beyond reasonable compensation and overhead would be considered profit and treated for tax purposes as a dividend. *See* 26 C.F.R. § 1.162–8 (1982).

**10.** We note that in a recent case in which the Cravath firm applied for fees under section 1988 the firm requested compensation at only $60 per hour, a rate well below the firm's average billing rate. *McCann v. Coughlin,* 698 F.2d 112 (2d Cir.1983).

number of productive hours per year and then adding a per-hour overhead cost, arrived at by dividing all non-salary costs for a year by the total of the productive hours in a year of all attorneys in the office. This cost-based approach would recognize that since the services of non-profit law offices are not allocated by a pricing mechanism, there is no real market billing rate that is precisely comparable for such offices. Indeed, cost-based fee awards have received increasing attention in recent years as an appropriate approach to all fee awards. *See Copeland v. Marshall, supra,* 641 F.2d at 908 (Wilkey, J., dissenting); *Glover v. Johnson,* 531 F.Supp. 1036 (E.D.Mich.1982); *Page v. Preissner,* 468 F.Supp. 399 (S.D. Iowa 1979); *Alsager v. District Court of Polk County,* 447 F.Supp. 572 (S.D.Iowa 1977).

Alternatively, a modified cost-based approach could be used that would combine the non-profit office's per-hour overhead cost with the value of an hour of an attorney's time, the latter component to be derived from the salary an attorney of comparable skill and experience is paid by a private law firm. This approach would reduce the windfall inherent in the use of a private firm's billing rate by eliminating both the profit component and the increment by which the private firm's overhead exceeds that of the non-profit office. By using the value of the non-profit attorney's time instead of the cost of that time to his employer it would produce a fee reflecting the costs the non-profit office would likely have incurred to hire the attorney were it not for budgetary limitations.

However attractive cost-based calculations of attorney's fee awards for non-profit law offices might be as a means of avoiding windfall recoveries, we are not disposed to mandate them for several reasons. First, the case law in this area, including our own decisions in *Torres* and *Beazer,* has approved, almost without exception, the use of billing rates as a basis for calculating fee awards for non-profit law offices and has generally counseled against an invariable distinction between non-profit law offices and profit-making firms in calculating fee awards. Second, the windfall effect occurs primarily when non-profit law offices are compensated at the billing rates of profit-making law firms at the higher end of the market; these are the rates that can be expected to reflect a substantial profit component and a substantial premium for high rent and other costs. Third, cost-based fee awards, if required as a general matter, would burden the parties and the district courts with inevitable disputes about cost accounting. Indeed, the burden of calculating costs was one of the reasons that influenced the majority of the District of Columbia Circuit to reject a cost-based approach to fee awards. *Copeland v. Marshall, supra,* 641 F.2d at 896–900. We are thus confronted with this dilemma: use of billing rates for fees of non-profit law offices produces windfalls, which Congress disapproved; on the other hand, use of cost-based rates would conflict with our precedents and create administrative burdens if generally required, and such rates are needed to avoid significant windfalls only when billing rates are high.

This statement of the problem suggests its own resolution: to award fees to non-profit law offices at billing rates of comparable attorneys in the general run of cases as long as the billing rates are not so high that their use risks significant windfalls, and to permit non-profit law offices to receive fees calculated at higher hourly rates only when such higher rates are justified to permit the offices to recover their costs. The point at which a claimed billing rate is so high as to yield a significant windfall to a non-profit law office will vary from one community to another and over time. We would expect the district judges throughout the Circuit to have general familiarity with the range of billing rates in the community of the applicant attorneys and to be able, without elaborate fact-finding, to select a "break point" beyond which a billing rate in that community at that time reflects both a significant profit component and overhead costs significantly higher than those of a non-profit office. Fees for non-profit law offices should not be based on hourly rates exceeding that "break point," except in the unlikely event that the applicant's non-prof-

it law office can demonstrate that a higher rate is required to enable it to secure reimbursement of its costs. We do not expect that even in the same community and at the same time each district judge will necessarily select the same "break point" as a presumptive maximum rate needed to avoid windfall fees to non-profit law offices. But we anticipate that the authority to place a ceiling on the appropriate private billing rate to be used in calculating fee awards for non-profit law offices will exert a moderating influence on those awards. This "break point" approach will avoid any distinction between non-profit law offices and profit-making firms in the general run of fee award claims where the billing rate of lawyers of comparable skill and experiences is below the figure that the judge would select as a "break point," but at the same time it will permit the judge to reject use of billing rates above that figure, which would yield significant windfalls, contrary to an expressed legislative objective. With this approach in use, we think it appropriate to end the uncertainty as to whether the fees of non-profit law offices will or will not be proportionately reduced to reflect the share of their budgets reimbursed by public funding, and we conclude that such reductions should not be made.

In this case, we have decided to apply the "break point" approach ourselves. *See Beazer v. New York City Transit Authority, supra,* 558 F.2d at 100–01 (revising amount of fee award); *Kamberos v. GTE Automatic Electric, Inc.,* 603 F.2d 598 (7th Cir.1979) (same). In light of billing rates in New York City in 1980, the last year for which fees are claimed in this application, we think that an appropriate "break point" to be used in this case is $75 per hour. We do not intend to preclude district judges in other cases from selecting a "break point" somewhat above or below the figure we have selected in this case. We simply conclude that as of 1980 fees for the claimants in this case should not be calculated at rates higher than $75 per hour, instead of at rates ranging from $70 to $140 as used by the District Court.

B. *Current or Historic Rate.* A further issue in determining an appropriate hourly rate is whether to use figures pertinent to the time when the services were provided or the time when the award is made. In this case, the District Court, using what it deemed comparable market rates, chose current rates over historic rates "to compensate [plaintiffs] for inflation and loss of interest" that had taken place between the time when the legal services were rendered and when the fees were awarded. 544 F.Supp. at 337 (citing *City of New York v. Darling-Delaware,* 440 F.Supp. 1132, 1134 (S.D.N.Y.1977)). Other district courts in the Southern District of New York have calculated fees based on historic rates. *See e.g., Desimone v. Industrial Bio-Test Laboratories, Inc.,* 83 F.R.D. 615, 621 (S.D.N.Y. 1979). To our knowledge, this Circuit has not yet decided whether current or historic rates should be used in calculating fee awards.

In ordinary cases resolved in a year or two, it will make little difference whether historic or current rates are applied: price levels at the time of the award will vary only slightly from those prevailing when the litigation was underway. But, with complex institutional litigation that can last for many years, the difference may be great. For instance, when the Willowbrook litigation began in 1972, the average billing rate for Cravath associates was $33 per hour. In 1980, when the Willowbrook plaintiffs filed their application for attorney's fees, the average Cravath rate was $85 per hour, over two-and-one half times the 1972 rate.

Neither historic nor current rates are ideal. Historic rates have the advantage of precision in that they are based on the amount that a private law firm would have charged for its work or, where costs are used, the amount that a non-profit law office actually spent to staff the litigation. But historic rates do not reflect inflation or the cost of forgone interest, and, therefore, undercompensate prevailing parties. As the District Court noted, current rates, in contrast, incorporate inflation into fee awards. But the incorporation is imprecise and can overcompensate prevailing parties. In this case, the District Court's use of

current rates gave plaintiffs a considerable windfall because Cravath's average billing rates grew much faster than inflation between 1972 and 1980. Moreover, the premise underlying use of current rates—that the firm would have billed and collected from the client during the litigation and therefore had the use of the money—is not true for non-profit law offices and frequently not true for private firms, especially in civil rights litigation.

We conclude that historic rates should be used for both profit-making firms and non-profit law offices in setting fee awards in multi-year cases. While not a perfect solution, the use of historic rates at least conforms to Congress' instruction to avoid windfall awards. However, we are reluctant to impose upon district courts an added burden of ascertaining precise year-by-year figures in every case. If the services were rendered over two or three years, relevant figures for the current year will normally still be appropriate. Even in protracted cases, it will be sufficient to divide the litigation into just two phases and use one rate for the early phase and a current rate for the later phase. In this case, where we have determined that a $75 rate should be used as a maximum rate for 1980 (unless the plaintiffs can demonstrate a higher cost figure), we think it appropriate to use that rate as the maximum rate for services rendered in 1978 and thereafter, and to use a $50 rate as the maximum rate for services rendered in prior years.[11] Since plaintiffs' attorneys were allowed 9,809

hours for the years prior to 1978 and 903 hours since 1978, this formula yields a basic compensation of $490,450 for the period before 1978 and $67,725 for the period after 1978 to date, for a total lodestar figure of $558,175.[12]

### V.

### Bonus

As a final matter, the state challenges the $411,864.11 bonus that the District Court added to its lodestar figure. The District Court awarded this sum in light of "the risk and complexity of the case, the results achieved and the superior advocacy of counsel." 455 F.Supp. at 342. In previous decisions, we have acknowledged a district court's authority to make upward adjustments in fee awards to compensate counsel for such factors, *see Cohen v. West Haven Board of Police Commissioners, supra,* 638 F.2d at 505; *Grinnell II, supra,* 560 F.2d at 1098, though we have not hesitated to scrutinize such bonuses and on occasion to disallow them, *see Beazer v. New York City Transit Authority, supra,* 558 F.2d at 100.

We agree with Judge Bartels that plaintiffs' counsel deserved some additional fee in recognition of the high quality of their work and the inherent complexity of the litigation. The Willowbrook litigation has undoubtedly been an extraordinarily difficult case for all concerned. In its early stages, the case raised novel questions of constitutional interpretation. In later years, when the litigation focused on the

---

**11.** We do not pretend to have arrived at the $50 figure with any degree of scientific precision. Between 1972 and 1977, the general price level in the United States was between one-half and three-quarters of the 1980 price level. *See Labor Relations Yearbook—1981,* at 452 (BNA 1982) (compiling Consumer Price Index). Since we have concluded that $75 per hour is an appropriate "break point" in this case for work done in 1980, we believe that $50, which is two-thirds of $75, is a suitable "break point" for the work done by plaintiffs' attorneys during 1972–1977. As with the $75 rate, if plaintiffs' attorneys can demonstrate to the District Court that their costs during this pre-1978 period were greater than $50 per hour, they are free to do so and to be reimbursed for their actual costs.

**12.** Since the billing rates used by the District Judge for legal services rendered after 1978 all exceeded $75 per hour and for legal services rendered before 1978 all exceeded $50, the maximum rates we are willing to allow in this case become the actual rates to be applied to the hours allowed in each of the two time periods.

The District Court had characterized some of the allowed hours as time spent on administrative matters for which a rate of $50 was applied. Since all hours compensated at that rate occurred in the period before 1978, our use of a $50 hourly rate for that period does not vary the compensation for these "administrative" hours.

enforcement of the consent decree, counsel have had to contend with equally complex issues concerning the litigation of institutional reform. Throughout the litigation the attorneys from the Civil Liberties Union and the Legal Aid Society have provided their clients with exemplary service. However, though we share the District Court's positive assessment of the quality of service rendered, we do not agree that the skill of counsel and the complexity of the issues merited an upward adjustment to the extent of 25% of the lodestar figure, as Judge Bartels awarded. In a case of this sort, we think a 10% adjustment sufficiently recognizes the exemplary nature of the services rendered.

■ Moreover, we think it entirely inappropriate for the District Court to have allowed plaintiffs an additional 25% bonus for work done before the consent decree was signed. In Judge Bartel's view, this additional bonus was necessary largely to reward plaintiffs' attorneys for "commit[ting] substantial time and resources when ... the prospects of success were speculative." 544 F.Supp. at 343. Although a component of a bonus for risk of failure may be appropriate in some cases to entice private firms to undertake difficult cases in which victory is uncertain, we believe that the promise of such rewards is not needed to induce non-profit organizations like the Legal Aid Society and the Civil Liberties Union to take on such cases. These organizations exist to represent groups like the Willowbrook class, with constitutional claims at the cutting edge of the law. We join those courts that have found it unreasonable to add contingency bonuses to fee awards for non-profit law offices. See McManama v. Lukhard, 464 F.Supp. 38, 43 (W.D.Va.1978), aff'd, 616 F.2d 727 (4th Cir.1980); Cole v. Tuttle, 462 F.Supp. 1016, 1019 (N.D.Miss.1978); McCormick v. Attala County Board of Education, 424 F.Supp. 1382, 1388 (N.D.Miss.1976).

The result of our review of the fee award is a reduction of the lodestar figure from the $978,052, awarded by the District Court, to $558,175, to which we add a reduced bonus of 10% or $55,817, for a total fee award of $613,992, exclusive of traditional taxable costs. On remand the District Court will enter a judgment awarding plaintiffs attorney's fees of $613,992, unless plaintiffs undertake to demonstrate to the District Court that their hourly costs exceeded the $50 and $75 per hour rates we have allowed for the pertinent time periods. In addition, the District Court will recalculate its award of traditional taxable costs to eliminate the items that plaintiffs now concede are not compensable.

To summarize our rulings for the guidance of the bar in future cases, we have ruled as follows:

1. All applications for attorney's fees, whether submitted by profit-making or non-profit lawyers, for any work done after the date of this opinion should normally be disallowed unless accompanied by contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done.

2. Attorney's fees awarded to non-profit law offices should be calculated at billing rates of private attorneys of comparable skill and experience, subject to a maximum "break point" rate to be selected by the district judge in each case at the point above which private billing rates include such a significant profit component and an overhead cost so significantly above that of non-profit law offices that use of such rates would produce a windfall for such offices. Non-profit law offices should not receive fees calculated at rates above the selected "break point" unless necessary to secure reimbursement of costs.

3. Attorney's fees awarded to non-profit law offices should not be reduced to reflect the extent of the office's budget reimbursed by public funding.

4. Attorney's fees for profit-making and non-profit lawyers should be based on current rates when the legal services were rendered within a two- or three-year period, but in protracted cases, rates relevant to the early and later stages of the litigation should be used.

5. Bonuses awarded to non-profit law offices, when awarded at all, should not exceed a modest percentage of the lodestar amount and should not include any incre-

ment for the uncertain risk of achieving success in the litigation.

The order of the District Court is reversed and the cause is remanded for further proceedings consistent with this opinion.

FRIENDLY, Circuit Judge, concurring:

If we were writing on a clean slate, I would think the appropriate hourly rate to be used in fixing the compensation of a non-profit organization in a case like this would be a rate reflecting the hourly compensation paid to private attorneys in the same community with equivalent experience, see *Rodriguez v. Taylor,* 569 F.2d 1231, 1248 (3 Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978), plus the non-profit office's per hour overhead. This would satisfy the indications in the Senate and House reports that the amount of fee awards in civil rights cases should be "governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases", Senate Report No. 1011, 94th Cong., 2d Sess. 6 (1976), *reprinted in* 1976 U.S. Code Cong. & Ad.News 5908, see also House Report No. 1558, 94th Cong., 2d Sess. 8 n. 16 (1976). It would avoid, however, the imposition on a defendant—often, as here, a financially hard pressed unit of state or local government—of an award that would clearly be a windfall, to wit, compensation for overhead that is required for the business of a large private law firm but is many times what the non-profit organization incurs or needs, not to speak of a profit element. The difficulties supposed to inhere in the calculation of the overhead factor are imaginary.[1] The non-profit office must keep records of its overhead and of the number and salaries of its attorneys for a variety of other purposes, see *Copeland v. Marshall, supra,* 641 F.2d at 928 n. 51 (dissenting opinion of Judge Wilkey), and any reasonable method of allocation, e.g., a weighted dollar-hour basis, should be acceptable. Courts seem to have become bemused by the apparent simplicity of "hourly billing rates" and apply these mechanically, without knowing just what they reflect[2] or to what use they are put.[3]

I recognize, however, that our decisions in *Torres v. Sachs,* 538 F.2d 10, 13 (2 Cir.1976) and *Beazer v. New York City Transit Authority,* 558 F.2d 97, 100 (2 Cir.1977), *rev'd on other grounds,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), look the other way, although the former, in a case where the award was $23,252, made no real analysis of the problem and the latter simply followed in its path. Hence, pending the clarification which hopefully will come from the Supreme Court in *Blum v. Stenson,* 671 F.2d 493, *cert. granted,* —— U.S. ——, 103 S.Ct. 2426, 77 L.Ed.2d 1314 (1983), I am willing to accept Judge Newman's "break point" approach as a solution which is more equitable to the defendants than the un-

1. The debate in *Copeland v. Marshall,* 641 F.2d 880, 896–900, 926 (D.C.Cir.1980) (en banc), concerned a slightly different subject—the allocation of the overhead of a large private law firm. Even as to this somewhat more complicated problem, the majority exaggerated the difficulties.

2. Hourly billing rates must include, in addition to the hourly compensation of associates and an imputed hourly compensation for partners, a proper allocation of overhead. No one seems to know to what extent they take account of the cost of hours that cannot be billed or must be billed at noncompensatory rates, or include a profit component even before adjustment to reflect the success of the firm's efforts, compare *Copeland v. Marshall, supra,* 641 F.2d at 917–18, with *Rodriguez v. Taylor, supra,* 569 F.2d at 1247. Very likely different firms have different practices in these respects.

3. Do they represent the fees billed in all cases, most cases, some cases? Are they a floor above which the firm endeavors to rise or a ceiling down from which it can be negotiated? Or, as seems most likely, are they simply figures to which the firm looks in exercising "billing judgment"? See *Hensley v. Eckerhart,* —— U.S. ——, ——, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (majority opinion of Justice Powell), ——, 103 S.Ct. at 1943 (concurring opinion of Chief Justice Burger), ——, 103 S.Ct. at 1945 (concurring and dissenting opinion of Justice Brennan) (1983). As Judge Newman points out, note 10, the "billing judgment" of the Cravath firm, whose "hourly billing rates" were used by the district judge in fixing plaintiffs' compensation, is to ask for considerably less when seeking compensation under § 1988, *McCann v. Coughlin,* 698 F.2d 112 (2 Cir.1983); see also *Rodriguez v. Taylor, supra,* 569 F.2d at 1248 n. 29.

checked "hourly billing rate" method and still is eminently fair to the plaintiffs.

WYZANSKI, Senior District Judge, concurring:

My reasons for concurring in Judge Newman's opinion require a brief statement.

Without qualification I agree with the substance and the form of Judge Newman's opinion on all matters except the amount to be allowed to counsel per hour and the amount, if any, of a bonus factor. What I propose to deal with here concerns only those two exceptions.

Like Judge Friendly, sitting in this case as a senior judge, I feel more than usually bound by prior decisions of this Court of Appeals for the Second Circuit. Indeed, being a senior judge assigned from another circuit, I am particularly deferential to the views of my colleagues based upon precedents established in their own regular circuit.

Bound by the precedents of *this* Court of Appeals, I do not consider myself free to adopt what, at least tentatively, I believe to be the sound measure of compensation, i.e. one based on the following three elements: (1) the rate per hour which a private attorney of equivalent competence would reasonably charge to compensate him for his own personal services, plus (2) the fee-applicant's own *actual* overhead (up to the point of but not beyond a reasonable amount), plus (3) an allowance (sometimes called a "bonus") reflecting the fact that many cases of a similar type are handled by the applicant-attorney or his organization without yielding him or it any compensation whatsoever, or less than reasonable compensation. My own approach would reach parallel conclusions whether the applicant be an attorney in private practice, or in a public-interest law firm, or in a government office, or elsewhere.

Inasmuch as I do not feel free in this particular case to follow the foregoing formula, and I am aware that, if not satisfied with Judge Newman's opinion, a party to this case may seek an *en banc* hearing of this case, and may file a petition for certiorari on a basis like that which on May 31,

1983 led the Supreme Court of the United States to grant review in *Blum v. Stenson,* Sup.Ct. Oct. Term 1982, No. 81–1374, s.c. 512 F.Supp. 680 (S.D.N.Y.), *aff'd,* 671 F.2d 493 (2d Cir.1981), I concur in Judge Newman's opinion. However, in so doing, I look upon the $75 "break-point", proposed by Judge Newman, as a mere *ad hoc* device for disposing of the case at bar. The $75 figure apparently comes from The Equal Access to Justice Act, which was designed to compensate defendants whom the government had sued without basis; it has no relation to appropriate compensation for attorneys serving in Civil Rights Act cases. Other circuits when dealing with Civil Rights Act awards have promulgated standards which impliedly permit an hourly allowance which in an appropriate case would exceed $75, e.g. *National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1324–7 (D.C.Cir.1982).

In summary, I concur with Judge Newman principally because I believe that the most appropriate and soundest course is for me to do all I can to expedite consideration of this case by an *en banc* court of this circuit and, if needed, by the Supreme Court of the United States.