William A. PICKMAN, and the Greater New York Council of the Blind, Plaintiffs,

v.

Elizabeth DOLE, in her capacity as Secretary of the United States Department of Transportation; Ralph Stanley, in his capacity as Administrator of the United States Urban Mass Transportation Administration; Hiram J. Walker, in his capacity as Acting Regional Administrator of the Urban Mass Transportation Administration, Region II; Metropolitan Transportation Authority; New York City Transportation Authority; Staten Island Rapid Transit Operating Authority; Robert Kiley, in his capacities as Chairman of the Boards of the Metropolitan Transportation Authority and the New York City Transit Authority; David L. Gunn, individually and in his capacity as President of the New York City Transit Authority; David Plavin, in his capacity as Executive Director of the Metropolitan Transportation Authority; Edward I. Koch, in his capacity as Mayor of the City of New York; New York City Department of Transportation; and Anthony Ameruso, in his capacity as Commissioner of the New York City Department of Transportation, Defendants.

No. 84 Civ. 2693 (RJW).

United States District Court, S.D. New York.

Oct. 14, 1987.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiffs; Nancy I. Ruskin, of counsel.

Albert C. Cosenza, General Counsel, New York City Transit Authority, Brooklyn, N.Y., for defendants; Eugene Freidus, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

William A. Pickman, who is blind, and the Greater New York Council of the Blind ("plaintiffs") brought this action against federal, state and local officials seeking an injunction requiring the installation of intercar safety barriers on subway cars operated by the New York City Transit Authority ("NYCTA") and by the Staten Island Rapid Transit Operating Authority ("SIR-TOA"). The parties settled the case after the defendants agreed to a timetable for completing installation of the barriers. Plaintiffs then filed this motion for attorneys' fees and costs. For the reasons set forth below, the Court holds that plaintiffs are prevailing parties in this action and entitled to reasonable attorney's fees.

## BACKGROUND

The controversy involving intercar safety barriers for R–44 and R–46 subway cars has a long and troubled history. Defendants first purchased the R–44 and R–46 subway cars in 1971, and through 1984, had put 1106 of these cars into service. Earlier cars had been equipped with pantographic gates extending between them.[1] The R–44 and R–46 cars were longer than the earlier cars, seventy five feet instead of sixty feet. The increased length of the cars led to added stress around curves, so that the old-style pantographic gates could not be fitted on the new cars. The cars were put in service without any safety barriers.

A blind person traveling on the subway commonly assists himself or herself with a cane. When a subway train lacks intercar safety barriers, a blind person attempting to board a train from a station platform could mistakenly perceive the empty space between two cars to be an open door into a waiting car. Beginning in 1971, after the R–44 and R–46 cars were put into service, through 1984, when these cars were equipped with safety barriers, there were at least six incidents when a blind person fell onto the subway tracks between cars while attempting to board a train. These incidents resulted in four deaths and one case of serious injury, where the victim lost three limbs. The sixth person was rescued by a bystander before the train pulled out of the station.

After the first of these incidents in 1971, advocates for the blind demanded that subway trains be equipped with intercar safety barriers.[2] In 1974, after the second incident, representatives of the blind met with transit officials, and received from them a commitment to develop and install an inter-car safety barrier on the R–44 and R–46 cars. Irwin Cohen, manager of the car overhaul program for the NYCTA, testified at an evidentiary hearing before this Court that a safety barrier for R–44 and R–46 cars was designed in 1976, prototypes were tested and approved, and material was ordered to outfit the entire fleet. However, just when the material arrived, cracks appeared in the fiberglass bonnet of the prototype cars due to stress, forcing the NYCTA to abandon the design. Transcript of July 26, 1985 Evidentiary Hearing ("Tr.") at 30–31. Defendants intended with this testimony to explain the assurances given by the NYCTA chairman in 1977 to the blind community that materials would be ordered "as quickly as possible," that the gates would be installed within six months after the NYCTA received the materials, and that installation of the gates on the R–44 and R–46 cars was in progress. Plaintiffs' Exhibits 3, 4.

After the abandonment of the gate design, the NYCTA evaluated several designs, but none were considered acceptable. Tr. at 32. In 1982, the NYCTA hired outside consultants, who by early in 1983 had developed a design for a spring-type barrier for the R–44 and R–46 fleet. Tr. at 32–34.[3] A prototype of the spring design was installed and tested in 1983, and certain modifications were made at the end of that year. Tr. at 35–36.

These developments were reported to the blind community in a letter dated September 16, 1983 from Mr. John Nelson, Vice President of External Affairs for the NYCTA. Mr. Nelson wrote that a prototype train outfitted with an assortment of experimental intercar safety barriers would be available for inspection on October 1, 1983. Tests would be conducted during the

---

1. A pantographic gate, also called a scissors gate, is made from metal rods joined to form parallelograms, and is extensible.

2. In response to inquiries, a representative of the New York Transit Authority suggested in a letter dated September 17, 1973 that blind persons using the subways learn to distinguish with their canes open car doors from the empty space between cars lacking intercar safety barriers. Plaintiffs' Exhibit 1. All exhibits referred to in this opinion are those presented to the Court at an evidentiary hearing held on July 26, 1985.

3. Mr. Cohen testified that attachment of the spring barrier to the fiberglass bonnets of the R–44 and R–46 cars was made possible by the development of a new epoxy by 3M Corp. working in conjunction with the NYCTA's consultants. Tr. at 34.

month of October, after which procurement and production of the barriers would begin. Mr. Nelson set a timetable to begin installation of the intercar barriers on February 1, 1984 and to complete the job by July 31, 1984. Plaintiffs' Exhibit 5.[4] In a follow-up letter of November 10, 1983, Mr. Nelson declared that testing was underway and that the installation program was on schedule. Plaintiffs' Exhibit 6.

In a February 15, 1984 letter, Mr. Nelson declined to confirm the expected completion date for the installation program. Defendants' Exhibit C. In a February 23, 1984 letter to a representative of the blind community, and in a February 24 memo to David Gunn, President of the NYCTA, Mr. Nelson asserted that in spite of procurement problems, the completion date of July 31, 1984 would be met. Defendants' Exhibits D, E. On March 22, 1984, however, Mr. Gunn reported that the July 31, 1984 completion date would not be met, and that a new timetable would be prepared. Plaintiffs' Exhibit 7. In a letter of the same date to Mayor Koch, Mr. Gunn declared that the installation of safety barriers would be complete by February 15, 1985. Plaintiffs' Exhibit 8.

Members of the blind community had first consulted Leboeuf Lamb Leiby & MacRae ("Leboeuf Lamb") in September of 1983. At first, LeBoeuf Lamb recommended a wait-and-see attitude to permit the NYCTA to demonstrate its good faith. Tr. at 13–16. In response to Mr. Gunn's letter abandoning the July completion date, plaintiffs asked LeBoeuf Lamb to file the present lawsuit. Tr. at 18.

Plaintiffs filed this action on April 16, 1984, seeking an injunction requiring the installation of intercar safety barriers on all R–44 and R–46 subway cars then in service. Plaintiffs also sought an injunction against planning, approving, issuing money for, or contracting for the purchase or lease of subway cars that are not equipped with such barriers.[5]

A memorandum dated April 16, 1984 from the Chief Mechanical Officer of the NYCTA to Charles Kalkhof, Vice President and General Manager, declared that the Intercar Safety Barrier program would be completed no later than December 31, 1984. Defendants' Exhibit I. Defendants presented several internal documents dated late March and early April that indicate an expected completion date of December 1984. Defendants' Exhibits K, L, M. Mr. Cohen testified that the schedule calling for completion of the safety barrier project by December 31, 1984 was developed in January of that year. Tr. at 37.

In a letter to Bronx Assemblyman Eliot Engel dated April 25, 1984, Mr. Gunn stated that the NYCTA was "in the process of developing a realistic program for installing intercar barriers." Plaintiffs' Exhibit 9. Interoffice memos dated April 26, 1984 from Mr. Nelson and from Mr. Gunn admonish NYCTA employees that no commitments should be made regarding intercar barriers before a production schedule had been approved. Plaintiffs' Exhibits 11, 12. In a letter to Mayor Koch, dated May 15, 1984, Mr. Gunn asserted that installation of the barriers would be complete "on or about December 31, 1984." Plaintiffs' Exhibit 13. At a May 22, 1984 meeting, Mr. Gunn orally assured the blind community that the installation program would be completed by December 31, 1984. Tr. at 19. In a June 18, 1984 letter, Mr. Gunn confirmed the December 31 completion date, and promised that the R–68 cars, then

---

**4.** The prototype train was never presented for inspection. Tr. at 17.

**5.** Plaintiffs named several defendants in this action. For convenience, defendants can be placed into three groups. Elizabeth Dole, Secretary of the United States Department of Transportation; Ralph Stanley, Administrator of the United States Urban Mass Transportation Administration ("UMTA"); and Hiram J. Walker, Acting Regional Director of the UMTA are referred to collectively as the "Federal Defendants." The Metropolitan Transportation Authority, the New York City Transit Authority, the Staten Island Rapid Transit Operating Authority, Robert P. Kiley, David L. Gunn, and David Plavin are referred to as the "Transit Authority Defendants." Edward I. Koch, the New York City Department of Transportation, and Anthony Ameruso are referred to as the "New York City Defendants."

on order, would not go into service without adequate barriers. Plaintiffs' Exhibit 15.

On July 20, 1984, all of the parties, except the New York City Defendants, entered into a Stipulation and Order on Consent (the "Consent Order"). According to the terms of the Consent Order, installation of intercar safety barriers on all R–44 and R–46 cars would be completed by December 31, 1984. Any cars lacking the barriers would be taken out of service on January 2, 1985. Furthermore, the Consent Order required that no cars of any design would be put into service unless they were equipped with barriers or gates. On January 2, 1985, defendant NYCTA advised plaintiffs that all subway cars in the R–44, R–46 and SIRTOA fleets had been equipped with intercar safety barriers in compliance with the Consent Order.

In a September 21, 1984 memorandum to the NYCTA Vice President for Procurement and Distribution, the Chief Mechanical Officer in charge of the intercar safety barrier installation project complained of late deliveries from a supplier. The Officer recommended cancelling outstanding orders with the delinquent supplier and finding alternative sources, cautioning that if the project was not completed by December 31, 1984, "we are legally obligated to take any cars without the Intercar Safety Barrier installed out of service." Plaintiff's Exhibit 16.

Plaintiffs now seek attorneys' fees against the Transit Authority Defendants in the amount of $39,040.47, as prevailing parties according to the provisions of section 505(b) of the Rehabilitation Act of 1973 (the "Act"), 29 U.S.C. § 794a(b). In opposing plaintiffs' application for fees, defendants [6] argue first that plaintiffs are not prevailing parties within the fee granting provisions of the Act, and second that plaintiffs' fee application is excessive and unreasonable.

## DISCUSSION

### 1. Prevailing Party

The Act provides for the award of reasonable attorney's fees to prevailing parties at the discretion of the district court. Section 505(b) of the Act provides as follows: "In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 29 U.S.C. § 794a(b).

This language is essentially identical to the attorney's fees provisions found, for example, in the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988; Titles II and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–3(b) and 2000e–5(k); and § 402 of the Voting Rights Act Amendments of 1975, 42 U.S.C. § 1973*l* (e). One court has held that analysis of fee claims under the Rehabilitation Act is identical to the analysis of claims under 42 U.S.C. § 1988. *Disabled in Action v. Mayor of Baltimore*, 685 F.2d 881, 885 n. 4 (4th Cir.1982). More specifically, the term "prevailing party" in § 505(b) means the same thing as in § 1988. *Disabled in Action v. Pierce*, 789 F.2d 1016, 1018 (3d Cir.1986). *See also Hensley v. Eckerhart*, 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983) (standards used in assessing attorney's fee applications under § 1988 are "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party' "). Accordingly, in its analysis of § 505(b), this Court will rely on cases interpreting various federal statutes that grant attorney's fees to prevailing parties.

To be a prevailing party within the meaning of section 505(b), it is not necessary to have won relief by means of a judgment. A party who obtains the desired relief through a settlement is entitled to fees as a prevailing party. *E.g., Maher v. Gagne*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980) ("The fact that respondent prevailed through a settlement rather than through litigation does not weaken her claim to fees."). Any other rule would

---

**6.** Because plaintiffs seek fees only from the Transit Authority Defendants, the Court will, when the context permits, refer to the Transit Authority Defendants simply as "defendants."

give parties an incentive to spurn reasonable settlement opportunities and press on to final judgment, contrary to both the intent of Congress and public policy. *See United States v. Board of Education*, 605 F.2d 573, 575–76 (2d Cir.1979) (28 U.S.C. § 1617).

■ The Court of Appeals for the Third Circuit has recently set forth a two step analysis for evaluating fee applications under section 505(b) where the parties have settled their litigation. The first step is to compare the relief sought with that actually obtained; the second step is to determine the causal connection between the relief obtained and the litigation. *Disabled in Action v. Pierce, supra*, 789 F.2d at 1019. This Court adopts the approach set forth in *Pierce*.[7]

■ First, the Court considers the relief obtained. There is no question here that the terms of the Consent Order provide essentially all the relief plaintiffs sought in their complaint. After thirteen years of frustration and delays, plaintiffs obtained an agreement whereby defendants promised to equip all their trains with intercar safety barriers within six months, and to pull out of service any cars still lacking the barriers at that time.

The Court next turns to the causal connection between the litigation and the relief obtained. Plaintiffs argue that their lawsuit prompted the installation of the safety barriers. Defendants assert that they had established a schedule for installing the safety barriers prior to initiation of the lawsuit, and that the safety barriers would have been installed by December 31, 1984 regardless of the lawsuit. Defendants claim that they agreed to the terms of the Consent Order because it only imposed on them burdens that they had already undertaken voluntarily.

Plaintiffs need not prove that their lawsuit was the sole cause for the installation of the safety barriers. Rather, they must establish only that the suit was a "catalytic, necessary, or substantial factor in at-

taining the relief." *Rose v. Heintz*, 806 F.2d 389, 391 (2d Cir.1986) (§ 1988). *See also Marci v. City of New Haven*, 503 F.Supp. 6, 8 (D.Conn.1980) ("[T]he lawsuit must have resulted in or been the catalyst of a victory....").

In assessing whether the lawsuit was a catalyst prompting or expediting the installation of the intercar safety barriers, the chronological sequence of events is an important factor to be considered. *United Handicapped Federation v. Andre*, 622 F.2d 342, 347 (8th Cir.1980). After a long history of disappointments, plaintiffs brought this action when defendants abandoned a July 31, 1984 completion date without providing a new date. Defendants assert that the December 31, 1984 date was established the previous January, well before the suit was filed. This assertion is supported by Mr. Cohen's testimony and by the internal documents produced by defendants. The April 16, 1984 memorandum from the Chief Mechanical Officer also tends to support defendants' assertion.

Documents dated concurrently with the filing of the lawsuit, however, are of limited probative value. Furthermore, it is difficult to square defendants' assertion with the bulk of the evidence. Twice in February 1984, Mr. Nelson asserted that the July 1984 completion date would still be met. In March, Mr. Gunn declined to provide the blind community with a new date after the July 1984 date was publicly abandoned, and in his March letter to Mayor Koch, Mr. Gunn quoted a February 1985 completion date. After this lawsuit was filed, on April 25, 1984, Mr. Gunn gave Assemblyman Engel only a general assurance that a program was under development. Mr. Gunn provided no target date at that time. Finally, the April 26 memoranda from both Mr. Nelson and Mr. Gunn caution against making any firm commitments before a production schedule had been approved. It is hard to understand these memoranda from the President of the NYCTA and from its Vice President for External Af-

---

7. The Court adopts this analysis as a useful framework for making the ultimate determination required by this Circuit, whether plaintiffs have "achieved some vindication of [their] rights as a result of the lawsuit." *Gingras v. Lloyd*, 740 F.2d 210, 212 (2d Cir.1984).

fairs if a firm schedule had been developed in January, three months before.

The Court finds that the NYCTA had not adopted prior to the filing of this lawsuit a firm timetable calling for completion of the intercar safety barrier project by December 31, 1984. To the extent internal documents created prior to initiation of the lawsuit set a target completion date of December, the Court finds that such a target was not firm and not intended for the public.

But even if the NYCTA had indeed established in advance of the lawsuit a firm target date of December 31, 1984, the Court finds that the lawsuit and the resulting Consent Order prevented the defendants from later abandoning this date and pushing completion of the project into 1985. Even such a seemingly small impact on defendants' behavior would be sufficient to render plaintiffs prevailing parties within the meaning of § 505(b). *See Disabled in Action v. Mayor of Baltimore, supra,* 685 F.2d at 886 (attorney's fees awarded where plaintiffs' efforts served to expedite planning and achievements gained); *United Handicapped Federation v. Andre, supra,* 622 F.2d at 348 (same). Such an effect would be particularly important in a case such as this, with a long history of completion deadlines that were not met.

Furthermore, the evidence suggests that even after defendants adopted the December 31, 1984 completion date, the deadline would not have been met absent the compulsion of the Consent Order. In September 1984, when the Chief Mechanical Officer in charge of the installation project complained of late deliveries from a supplier, he recommended cancelling the order and finding alternative sources, noting the NYCTA's legal obligation to install the barriers by December 31, 1984. There is no suggestion, especially in light of the long history of missed deadlines, that absent this legal compulsion, defendants would respond so aggressively when faced with a delinquent supplier.

This is not a case where the plaintiffs obtained only benefits that defendants plainly would have conferred even in the absence of a lawsuit. *See Gingras v.*

*Lloyd,* 740 F.2d 210, 213 (2d Cir.1984) (§ 1988). On the contrary, the Court finds that defendants took action they would not have taken in the absence of the suit, or at the very least, that defendants abandoned, accelerated, or slowed planned actions. *Id.*

The Court has full discretion to determine the extent to which plaintiffs' participation contributed to the resolution of the case and to adjust the fee award accordingly. *United States v. Board of Education, supra,* 605 F.2d at 577. In the instant case, the Court concludes that plaintiffs are prevailing parties and are entitled to reasonable attorney's fees.

### 2. Reasonable Attorney's Fees

■ "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart, supra,* 461 U.S. at 433, 103 S.Ct. at 1939. Other considerations may lead the court to adjust the fee upward or downward. *Id.* at 434, 103 S.Ct. at 1940. The most important of these additional considerations is the "results obtained." *Id. See, e.g., United Handicapped Federation v. Andre, supra,* 622 F.2d at 348 (fee award reduced because plaintiffs spent considerable amount of time in an unsuccessful attempt to block defendant's purchase of 300 municipal buses that were not equipped to handle the handicapped). As discussed above, plaintiffs in this case fully achieved the relief they sought. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart, supra,* 461 U.S. at 435, 103 S.Ct. at 1940. Accordingly plaintiffs will be awarded the fees requested to the extent they are reasonable.

### A. Hours Reasonably Expended

Plaintiffs' attorneys have presented detailed contemporaneous time records documenting their work on this case, as required in this Circuit. *New York Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1147–48 (2d Cir.1983). Plaintiffs seek compensation for 384 hours of attorney and paralegal time. The hours presented by

plaintiffs' attorneys amount to: 253 hours spent by Ms. Ruskin, who as a third year associate served as lead counsel on this case; 102.25 hours spent by Ms. Feigenbaum, an associate who performed research on the case; 4 hours spent by Mr. Platt, a senior associate who advised Ms. Ruskin; 8 hours by Mr. Lewis, a partner who also served as an advisor on the case; and 16.75 hours spent by paralegals.

Defendants challenge the hours claimed by plaintiffs' attorneys as excessive and unreasonable. Specifically, defendants object to 136 hours plaintiffs' attorneys spent preparing the complaint, 36 hours spent on an unrelated administrative case, and time spent preparing their fee application. Plaintiffs' attorneys respond that the time allocated to preparation of the complaint included not only drafting and editing the complaint, but research on potential federal and state causes of action, and a review of the thirteen year history of the intercar safety barrier problem. Plaintiffs' attorneys assert that time spent on the administrative proceeding was necessary for their overall understanding of the intercar safety barrier problem.

█ The Court will not disallow the time counsel spent preparing its fee application. Time reasonably spent on a fee application is compensable. *New York State Ass'n for Retarded Children v. Carey, supra,* 711 F.2d at 1148; *Gagne v. Maher,* 594 F.2d 336, 344 (2d Cir.1979), *aff'd on other grounds,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). The time spent preparing the fee application will be scrutinized for reasonableness along with the balance of the time claimed by plaintiffs' attorneys.

The Court recognizes that preparation of the complaint in this case necessarily involved research as to which federal or state causes of action might be available to plaintiffs, as well as issues of institutional standing. However, this litigation had but a brief duration; the complaint was filed on April 16, 1984 and the Consent Order was entered on July 20 of the same year. The essential tasks required of plaintiffs' attorneys in this case were limited to preparing the complaint, negotiating the Consent Order, and preparing the fee application. Accordingly, the Court finds the hours claimed by counsel to be excessive.

█ If a fee application is excessive, it is not denied in full, but only to the extent of the excess. *Disabled in Action v. Mayor of Baltimore, supra,* 685 F.2d at 886. Courts have approved percentage cuts in the number of hours allowed as a practical means of trimming fat from a fee application. *New York State Ass'n for Retarded Children, Inc. v. Carey, supra,* 711 F.2d at 1146. Thus, in *Carey,* the Second Circuit affirmed a fee award that the district court had calculated by cutting the hours of the five lead attorneys by five to twenty per cent. *Id. See also Gagne v. Maher, supra,* 594 F.2d at 345 ("district court did not commit error in disallowing one-half of the hours worked because 'the issues involved in the case were relatively simple and most attorneys would not have spent so many hours on the case'"); *Ross v. Saltmarsh,* 521 F.Supp. 753, 761–62 (S.D.N.Y.1981) (5% and 10% cuts in fee application under § 1988), *aff'd mem.,* 688 F.2d 816 (2d Cir. 1982); *Kane v. Martin Paint Stores, Inc.,* 439 F.Supp. 1054, 1056 (S.D.N.Y.1977) (10% cut in antitrust case), *aff'd mem.,* 578 F.2d 1368 (2d Cir.1978).

█ The district court has broad discretion to assess "the extent of staffing and background research appropriate for a given case." *New York State Ass'n for Retarded Children, Inc. v. Carey, supra,* 711 F.2d at 1146. Drawing on that discretion and concluding that the hours spent by plaintiffs' counsel were excessive in light of the limited nature of the present proceedings, the Court will reduce by twenty five per cent the hours spent by Ms. Ruskin and Ms. Feigenbaum. Accordingly, the court will award fees for 189.75 hours spent by Ms. Ruskin, 76.75 hours spent by Ms. Feigenbaum, 4 hours spent by Mr. Platt, 8 hours spent by Mr. Lewis, and 16.75 hours spent by paralegals.

## B. Reasonable Hourly Rate

█ Reasonable attorney's fees are to be calculated "according to the prevailing

market rates in the relevant community." *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984) (§ 1988).[8] *See also, e.g., McCann v. Coughlin,* 698 F.2d 112, 130 (2d Cir.1983) ("Reasonableness should be measured according to the normal rate in the legal community for substantially similar work by competent practitioners."). Plaintiffs request $94.52 per hour for Ms. Ruskin's time, $102.68 per hour for Ms. Feigenbaum's time, $125 per hour for Mr. Platt's time, $225 per hour for Mr. Lewis' time, and $44.62 per hour for paralegals. These hourly rates represent a composite of the different hourly rates charged by the firm for the individuals' time during the course of the litigation. Defendants argue that these rates are excessive.

In *Blum v. Stenson, supra,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891, the Supreme Court approved as reasonable an award of fees based on hourly rates ranging from $95 to $105 per hour for work performed between 1978 and 1980 by attorneys with between one and three years of experience. *Id.* at 890 n. 4, 901–02, 104 S.Ct. at 1544–45 n. 4, 1550. The Second Circuit has approved a fee award derived from the prevailing billing rate at Cravath Swaine & Moore, that is $75 per hour for the work of junior associates performed between 1978 and 1980. *New York State Ass'n for Retarded Children, Inc. v. Carey, supra,* 711 F.2d at 1143. Accordingly, the Court concludes that the rates requested to compensate Ms. Ruskin and Ms. Feigenbaum are reasonable. In addition, the rate requested for Mr. Platt is reasonable, in light of his senior status, the advisory role he played in this litigation, and the moderate amount of time he spent on the case.

█ Recent decisions in this District have refrained from compensating senior litigators at a rate in excess of $150 per hour. *E.g., Grogg v. General Motors Corp.,* 612 F.Supp. 1375, 1380, 1382 (S.D.N.Y.1985) (top rate of $130 per hour for work performed prior to 1983); *Mendoza v. Blum,* 602 F.Supp. 200, 203 (S.D.N.Y.1985) (top rate of $150 per hour for work performed between 1978 and 1984); *Williamsburg Fair Housing Comm. v. Ross–Rodney Housing Corp.,* 599 F.Supp. 509, 521 (S.D.N.Y.1984) ($150 per hour for work performed between 1981 and 1984). Legal Aid attorneys are entitled to fees at the prevailing rate up to a cap over which any higher level of compensation would constitute a windfall. *New York State Ass'n for Retarded Children, Inc. v. Carey, supra,* 711 F.2d at 1150–52. Even at a private firm, a similar cap is appropriate in order to prevent a windfall, after the higher operating costs of a private firm are taken into account. *See McCann v. Coughlin, supra,* 698 F.2d at 130 (court not bound by rate which lawyer charges other clients). The Court finds that a reasonable rate for compensating Mr. Lewis, a partner in a Manhattan law firm, is $150 per hour for work performed in 1984. This reduction in the rate requested by Mr. Lewis does not in any way reflect the quality of his representation.

Paralegals will be compensated at a rate of $25 per hour. *See, e.g., Grogg v. General Motors Corp., supra,* 612 F.Supp. at 1382–83 (requested rate of $35 per hour for paralegals cut to $25). In addition, the Court grants plaintiffs' attorneys' request for reimbursement of their disbursements.

### C. Fee Award

█ The product of the time reasonably spent on this case multiplied by the reasonable rate of compensation, as determined by this Court, is calculated as follows.

|  | Hours | Rate | Value |
|---|---|---|---|
| Ms. Ruskin | 189.75 | $ 94.52/hr | $17,935.17 |
| Ms. Feigenbaum | 76.75 | $102.86/hr | $ 7,894.51 |
| Mr. Platt | 4.00 | $125.00/hr | $ 500.00 |
| Mr. Lewis | 8.00 | $150.00/hr | $ 1,200.00 |
| Paralegals | 16.75 | $ 25.00/hr | $ 418.75 |
| Disbursements |  |  | $ 1,579.22 |
| Total |  |  | $29,527.65 |

This figure is presumed to equal the reasonable fee contemplated by statute.

8. The fee applicant has the burden to produce satisfactory evidence "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* at 896 n. 11, 104 S.Ct. at 1547 n. 11.

*Blum v. Stenson, supra,* 465 U.S. at 897, 104 S.Ct. at 1548. *See also DiFilippo v. Morizio,* 759 F.2d 231, 234 (2d Cir.1985) (lodestar figure is presumptively appropriate); *Martin v. Supreme Court,* 644 F. Supp. 1537, 1545 (N.D.N.Y. 1986) (same). This calculation may be modified, however, to take into account special factors.[9] Ordinarily, however, these factors, such as the novelty or complexity of the case, the skill and experience of the attorneys, and the quality of representation, will be reflected in the Court's initial determination of a reasonable number of hours and a reasonable rate. *Blum v. Stenson, supra,* 465 U.S. at 898–99, 104 S.Ct. at 1549.

Plaintiffs in this case did not request any upward adjustment. The defendants' arguments for a downward adjustment are not persuasive. That the litigation was settled quickly does not support a reduction in the fee award. *See Reid v. State of New York,* 584 F. Supp. 461, 462 (S.D.N.Y.1984).

Defendants assert that it is inappropriate to assess against them the entire fee award, since there were multiple defendants in the case. However, a full assessment is appropriate in this case, because plaintiffs obtained from the Authority Defendants essentially the entire relief desired. Furthermore, plaintiffs' claims against the other defendants all arose out of the same common factual core, and time spent investigating or preparing one or another aspect of the case could not be neatly separated from time spent on winning the claim. *Spano v. Simendinger,* 613 F.Supp. 124, 125–26 (S.D.N.Y.1985). *See also Lyons v. Cunningham,* 583 F.Supp. 1147, 1152–53 (S.D.N.Y.1983) (no reduction in fees though plaintiff prevailed against only two of nine defendants, where legal theories underlying all claims were related). The Court, therefore, rejects the argument of the Authority Defendants that plaintiffs' fee request must be reduced because plaintiffs are seeking fees from only some of the defendants originally named in this action.

**9.** The factors to be considered are set forth in *Hensley v. Eckerhart, supra,* 461 U.S. at 430 n. 3,

CONCLUSION

Plaintiffs in this action are prevailing parties and entitled to reasonable attorney's fees. The Court, accordingly grants plaintiffs' motion and awards to plaintiffs $29,527.65 for fees and disbursements.

It is so ordered.