[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR ATTORNEYS' FEESCT Page 8555DATED OCTOBER 27, 1995
The pending motion for attorneys' fees represents the latest chapter in the long legal odyssey of Arthur Mulligan, whose case first found its way into court in 1985. In the instant phase of this matter, Mr. Mulligan seeks an attorneys' fee award of $740,097.50 pursuant to Title 42, United States Code, Section 1988 in connection with 3,560.4 hours of legal work claimed to have been performed on his behalf in a civil case which resulted in a verdict of $1,332,417, including interest. Defendants argue that no attorneys' fees at all should be awarded because plaintiff's request is outrageously excessive and because plaintiff failed to specifically request attorneys' fees in his prayer for relief. Defendants argue alternatively that if an attorneys' fee is awarded, it should be in the amount of only $195,396.75.
Having considered the full record in this case, including the testimony and evidence produced at the April 26, 1996 hearing, the trial court and the appellate court files, the briefs of counsel and their arguments, I have concluded that an attorneys' fee award is permitted by law pursuant to 42 U.S.C. § 1988
and that an award in the amount of $381,489.70 is appropriate for the reasons stated below.
Factual Background
A review of the salient facts in this matter is necessary to place this latest chapter of the case in context. Given that the case has generated two written appellate court decisions in which the facts have been carefully laid out, see the Supreme Court's decision in Arthur J. Mulligan v. Robert Rioux, 229 Conn. 716
(1994) and the Appellate Court's decision in Mulligan v. Rioux,38 Conn. App. 546 (1995), I will quote from Judge Foti's extensive factual statement in the second appeal to provide background:
 The following facts are necessary for the resolution of this appeal. In the fall of 1985, the plaintiff was finishing his seventeen year career as the director of the department of public works for the town of East Hartford. On October 28, 1985, four days before his planned retirement, CT Page 8556 the plaintiff was arrested and charged with violating an East Hartford town bidding ordinance. The warrant that provided a basis for the plaintiff's arrest was prepared by the defendants, Detective Robert Rioux and Detective Gerald Myers, and contained allegations that the plaintiff had continued a contract for lubrication services from Automatic Lubrication after the contract had terminated and without putting it out to bid. On November 19, 1985, the plaintiff was arrested for a second time, again on the basis of a warrant prepared by the defendants. The November 19 arrest resulted in twelve charges against the plaintiff for allegedly receiving bribes from Automatic Lubrication in the form of twelve rounds of golf at the Blackledge Country Club. The plaintiff's arrests were reported in various local newspapers and featured on local news on television.
 On February 20, 1987, the plaintiff was acquitted of all charges against him. Thereafter, in September, 1987, the plaintiff instituted a civil action against the defendants alleging malicious prosecution and a violation of his federal civil rights pursuant to 42 U.S.C. § 1983 based on both arrests. In his complaint, the plaintiff alleged that (1) the defendants had failed to investigate properly the charges relating to both arrests and had submitted an affidavit in support of both arrests that contained numerous false and inaccurate statements, (2) the arrests were made without probable cause and with malice, and (3) as a result, the plaintiff had received "massive amounts of unfavorable publicity," greatly damaging his reputation, and had experienced humiliation, disgrace and mental anguish.
 At trial, the plaintiff introduced evidence on the issue of damages that his reputation had been destroyed as a result of the arrests and that he and his family had suffered both physically and mentally. The plaintiff's wife testified that the plaintiff had difficulty eating and sleeping after the arrests. Other evidence established that the plaintiff became withdrawn and mistrusting of CT Page 8557 people and that his self-esteem was severely damaged.
 In addition to the alleged intangible injuries, the plaintiff introduced evidence concerning his claim for lost earning capacity. Evidence was introduced that the plaintiff had planned to work in the private sector after he retired from public office, but those plans collapsed due to his damaged reputation. He testified that his goal was to achieve financial security for himself and his wife and he was willing to work as many hours as necessary to achieve that goal. The plaintiff introduced evidence that his annual salary with the department of public works was $48,000 plus benefits and that he could make more in the private sector. Specifically, he testified as to two employment opportunities that he considered pursuing after his retirement. The first was a company started by the plaintiff and two colleagues, James Fitzgerald and Eugene Paganetti. The plaintiff was not active in the corporation while in public office, but planned to join and act as a manufacturers representative upon his retirement. The business, however, collapsed after the arrests because of the damage to the plaintiff's reputation and credibility. The second was an opportunity with David Hanlon of DRJ Associates. Hanlon testified that he spoke with the plaintiff in the early fall of 1985 about representing engineers and contractors seeking business with Connecticut state and municipal governments. Hanlon testified that the plaintiff would have been ideal for the job because of his credibility and his valuable professional and political ties in Connecticut and that he could have earned between 4 and 8 percent of the company's gross sales in Connecticut, depending on the level of involvement that the plaintiff chose. Gross sales in Connecticut at the time were approximately $1.5 million.
 At the close of the evidence, the trial court instructed the jury that if it found for the plaintiff it would have to consider the issue of CT Page 8558 damages. The jury was informed that "[d]amages for malicious prosecution are not limited to easily determined special damages such as attorney's fees or 1088 of time from work. . . . Damages are also designed to compensate for intangible injuries such as mental anguish, humiliation, embarrassment, mortification, shame, fear, and damage to reputation." The jury returned a general verdict for the plaintiff on all counts of his complaint and awarded him damages totaling $974,000.
 The defendants moved the trial court to set aside the jury's verdict and for judgment notwithstanding the verdict, claiming, inter alia, that the defendants were protected from liability under the doctrine of qualified immunity and that the verdict was excessive as a matter of law. The trial court concluded that the defendants were entitled to qualified immunity, set aside the verdict of the jury, and rendered judgment for the defendants on all counts of the plaintiff's complaint.
 The plaintiff, thereafter, appealed to this court and the appeal was transferred to the Supreme Court pursuant to Practice Book § 4023 and General Statutes § 51-199. Our Supreme Court reversed the judgment of the trial court, finding that the trial court applied the incorrect standard of qualified immunity to the plaintiff's common law claims and had improperly substituted its judgment for that of the jury on factual issues relating to the plaintiff's civil rights claim. Mulligan v. Rioux, 229 Conn. 716, 726-38, 643 A.2d 1226 (1994). Although the Supreme Court's reversal reinstated the verdict, it remanded the case to the trial court for a determination of the defendants' claim that the verdict was excessive as a matter of law and based on inadmissible evidence of lost earning capacity. Id., 752.
 On remand, the trial court found that the evidence before the jury on the issue of lost earning capacity established that the plaintiff intended to do only part-time work after his retirement from the department of public works. The trial court CT Page 8559 did not find the evidence presented by Hanlon to be inadmissible, but stated that Hanlon's testimony "did not provide a basis for the jury putting a dollar amount on lost earning capacity from that source." The trial court, therefore, concluded that the evidence produced by the plaintiff in support of his claim for lost earning capacity was too speculative to support the jury's verdict. The trial court set aside the verdict and ordered that a new hearing in damages be held. The appeal followed.
In its July 25, 1995 decision, the Appellate Court reversed the trial court and remanded the case with instructions to reinstate the $974,000 verdict. On September 8, 1995, defendants furnished plaintiff with a check for $1,332,417, which included interest.[1]
* * * * * * * * * *
Legal Analysis
A. Is Plaintiff Entitled to Attorneys' Fees Under42 U.S.C. § 1988 as the Prevailing Party in a Section 1983 Action Where Plaintiff Failed to Include an Explicit Demand forAttorneys' Fees in His Prayer for Relief?
Defendants argue that because plaintiff failed to include a specific request for attorneys' fees in his prayer for relief, he may not seek attorneys' fees pursuant to Title 42, United States Code, Section 1988. In support of this argument, defendants rely on various sections of the Connecticut Practice Book and numerous cases, including Francis T. Zappone Co. v. Mark, 197 Conn. 264
(1985) and Solomon v. Hall-Brooke Foundation, Inc., 30 Conn. App. 129
(1993). Defendants also assert that they would be unfairly prejudiced by an award of attorneys' fees, after having tried the case and litigated two appeals, during which time plaintiff never asserted a claim for attorneys' fees in his complaint. I disagree.
Title 42, U.S.C. § 1988 provides that in certain specified federal civil rights actions, "the court in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." (In this case, it is uncontested that plaintiff was the "prevailing CT Page 8560 party" in his Section 1983 claim.) This language has been interpreted as creating an expectation that a prevailing party should receive reasonable attorneys' fees for time reasonably expended, in the same manner that an attorney traditionally is compensated by a fee-paying client, unless special circumstances would render such an award unjust. Hensley v. Eckerhart, 461 U.S. 424,429 (1983). The important purpose of Section 1988 is to ensure that competent legal counsel is available to civil rights plaintiffs and to assure effective access to judicial process for persons with civil rights grievances. Blanchard v. Bergeron,489 U.S. 87 (1989).
As plaintiff notes, Practice Book Section 140 states in relevant part that "interest and costs need not be specially claimed in the demand for relief, in order to recover them." Moreover, White v. New Hampshire, 455 U.S. 445 (1982), and Oakleyv. Commission on Human Rights and Opportunities, 38 Conn. App. 506
(1995) both militate against accepting defendants' argument. In White, the United States Supreme Court held that regardless of when attorneys' fees are requested, Section 1988 attorneys' fees "receive an inquiry separate from the decision on the merits — an inquiry that cannot even commence until one party has prevailed." The Court also stated: "Unlike other judicial relief, the attorney's fees allowed under Section 1988 are not compensation for the injury giving rise to the action. Their award is uniquely separable from the cause of action to be proved at trial." Id. at 451-52. The court ruled that a claim for attorneys' fees made four-and-a-half months after final judgment was not untimely and was not subject to the limitation imposed by Rule 59(e) of the Federal Rules of Civil Procedure.
In Oakley, the Appellate Court approvingly cited White and analogized Section 1988 to Connecticut General Statutes Section4-184a, "Award of reasonable fees and expenses to certain prevailing parties in appeals of agency decisions." The court noted that each statute requires "an inquiry separate from the judgment itself . . ." 38 Conn. App. at 517. The court decided that a failure to specifically claim attorneys' fees in the complaint did not constitute a waiver, and that a claim for fees first made nearly five months after final judgment was not untimely. The court stated that the trial court's grant or denial of a motion for attorneys fees "does not open, modify or in any way affect the judgment. It would therefore be inappropriate to apply time limitations that govern these types of motions."Oakley, 38 Conn. App. at 517. The court held that "post judgment CT Page 8561 motions under Section 4-184a must be filed within a reasonable time of the entering of the final judgment, and that the determination of whether such a motion has been filed within a reasonable time is a matter within the discretion of the trial court." Id. In this case, review of the record persuades me that the plaintiff's motion for attorneys' fees, filed as part of his bill of costs on August 31, 1995, within weeks of final judgment, was timely. Neither Zappone nor Solomon is a Section 1983 case, as plaintiff notes. Accord, Neiditz v. Housing Authority,42 Conn. App. 409, 412 (1996).
Defendants' assertion that the claim for attorneys' fees comes as a surprise or somehow unfairly prejudices them is clearly at odds with the record. Review of the file indicates that from the very beginning of this case, defendants were on notice that plaintiff would seek attorneys' fees. The July 24, 1987 notice to the Town Clerk, Town of East Hartford, appended to the initial September 17, 1987 complaint, states in part that damages to Mr. Mulligan "include but are not limited to damage to his reputation, damage to his capacity to find and maintain gainful employment, humiliation, disgrace, mental anguish, physical discomfort and personal damages, including attorneysfees." (Emphasis added.) Paragraph 15 of the Fifth Count alleges in relevant part that "Plaintiff will be forced to incur substantial additional obligations for attorneys' fees . . . because of the unfounded and unwarranted prosecution by the defendants." (Emphasis added.) The prayer for relief requested "such other relief which the court may deem appropriate," as was the case in Oakley. On June 17, 1992, at the time of a post-verdict hearing on various motions, Attorney (now Judge) Robert Beach, counsel for defendant stated: "Your Honor, I understand that the plaintiffs [sic] do intend to include a motion for attorney's fees at such time as the case at this level should become final." Judge Beach asked the court to take the fee issue up prior to the entry of judgment, but, as plaintiff notes, the court set aside the jury's verdict and had no need to address the issue at that time.
Finally, Section 6 of the Connecticut Practice Book states that the rules should be construed liberally to facilitate business and advance justice. To adopt defendant's arguments would not, in my view, advance justice in this case.
In summary, the facts of this case in light of the relevant precedents persuade the Court that the claim for attorneys' fees CT Page 8562 was timely asserted and that considering it will in no way unfairly prejudice defendants.
B. Discussion of General Applicable Legal Principles
An award of attorneys' fees is an integral part of a prevailing plaintiff's remedies to obtain compliance with Title42 U.S.C. § 1983. Maine v. Thiboutot, 448 U.S. 1, 10-11
(1980). As noted, a prevailing party in an action brought pursuant to Section 1983 "should ordinarily recover an attorneys' fee unless special circumstances would render such an award unjust." Hensley v. Eckerhart, 461 U.S. 42 (1983). See alsoMid-Hudson Legal Services, Inc. v. G. U., 578 F.2d 34, 38 (1978). Courts have evaluated attorneys' fee requests in light of the 12-factor analysis discussed in Johnson v Georgia Highway Express,Inc., 488 F.2d 714, 717-719 (5th Cir. 1974), including most notably consideration of the degree of success obtained by the plaintiff. But the centerpiece of analysis in attorneys' fee award cases pursuant to Section 1988 has been and continues to be "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart,461 U.S. 424, 433 (1983). This figure, commonly referred to as the "lodestar," provides an objective framework within which to evaluate an attorneys' fee request, and is presumed to be the reasonable fee contemplated by Section 1988. Riverside v. Rivera,477 U.S. 561, 568 (1986). Section 1988's provision for allowing attorneys' fees contemplates "reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff, no more or no less." (Emphasis added.) Blanchard v. Bergeron, 489 U.S. 87, 93 (1989). There is a "strong presumption" that the "lodestar figure" represents a reasonable fee. Pennsylvania v. Delaware ValleyCitizens' Council for Clean Air, 478 U.S. 546, 565 (1986). Notwithstanding the above, as defendants note, the burden is on the fee applicant "to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum v. Stenson,465 U.S. 886, (1984). See also Jane L. v. Bangerter, 828 F. Sup. 1544,1547 (D.Utah 1993), rev'd on other grounds, 61 F.3d 1505
(10th Cir. 1995) (burden of fee applicant is to "prove and establish the reasonableness of each dollar, each hour, above zero.") The party seeking a fee award must produce contemporaneous time records of sufficient detail to permit a neutral judge to make a fair evaluation of "the time expended, CT Page 8563 the nature and need for the service, and the reasonable fees to be allowed." New York Association for Retarded Children v.Carey, 711 F.2d 1136, 1148 (2d Cir. 1983). In exercising the discretion of determining reasonable hourly rates and what constitutes a reasonable amount of time spent, a court must conduct "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended," Lunday v. City of Albany,42 F.3d 131, 134 (2d Cir. 1994), particularly where the request is as large as the instant one. The court has the authority to formulate a fee award so as to ensure that a windfall is avoided.Wheatley v. Police Officers, 679 F.2d 1037, 1041 (2d Cir. 1982).
In evaluating what is a reasonable hourly rate for attorneys, law clerks, and paralegals, the court may rely on its own knowledge of hourly rates in the community. Association forRetarded Citizens of Connecticut, Inc. v. Thorne, 68 F.3d 547,554 (2d Cir. 1995). The court may also consider awards made in other cases, Cruz v. Local Union No. 3 of the InternationalBrotherhood of Electrical Workers, 34 F.3d 1148, 1160 (2d Cir. 1994), as it evaluates the experience level of counsel generally, the experience of counsel in civil rights cases, and prevailing hourly rates in the geographic area being considered.
A court may choose to apply different rates for different time periods in the event of protracted litigation. New YorkAssociation for Retarded Children v. Carey, 711 F.2d 1136, 1147
(2d Cir. 1983); Grant v. Martinez, 973 F.2d 96 (2d Cir. 1992). InCarey, the United States Court of Appeals for the Second Circuit endorsed the use of "historic rates" as opposed to "current rates" in calculating hourly rates in protracted cases where appropriate. See also Ieva v. Grabowski, Docket No. B-75-316 (D.Conn. July 27, 1983, Daly, J.).
Analysis and Evaluation of the Request for Attorneys' Fees.
Before turning to specifics, a brief overview of plaintiff's request for attorneys' fees is appropriate.
The invoices representing the fee request, Plaintiff's Exhibit 1, are approximately one-half inch thick and contain 113 pages of entries. They reflect contemporaneous time records of the 3,560.4 hours billed. The first entry is dated May 27, 1987. The final entry is October 17, 1995. Most of the 113 pages contain a minimum of 10 entries, often more. Time is billed in CT Page 8564 tenth-of-an-hour increments, in accordance with standard practice. Brief descriptions of the work performed are provided. The invoices document the work performed on the civil case by 21 attorneys with Cooney, Scully and Dowling; two former attorneys; five law clerks; and four paralegals during more than 8 years. The invoices represent work performed in connection with the civil case only and do not reflect any time spent in connection with the preceding criminal case. They do not, according to the hearing testimony of John T. Scully, reflect all of the hours actually spent on the case.
The First Phase of the proceedings as that term is used in this memorandum relates to work performed between May 27, 1987, and January 2, 1992, up to the conclusion of trial. This time span amounts to more than 4 years, 7 months. In the First Phase of the proceedings, plaintiff is seeking a total award of $274,972.50 in attorneys' fees in connection with 1,423.6 hours of work claimed. To put this in context, this is the approximate equivalent of one person billing 40 hours a week for 35 weeks. The invoices indicate that the vast majority of that work was performed by John T. Scully and Joseph A. La Bella, who logged 709.8 hours and 546.3 hours respectively, accounting for a total of approximately 88 percent of the work performed in the First Phase. The remaining 167.5 hours of work are claimed in connection with services rendered by other persons during the First Phase, including five associates, two partners, one law clerk, and two paralegals. Submissions received by the court indicate that John T. Scully had approximately six years of experience when the First Phase commenced, and approximately 11 years of experience when it ended in January, 1992. Submissions indicate that Mr. La Bella was a new associate when he started working on the case in the First Phase. According to a summary of legal work performed by category which plaintiff has submitted, 257.8 hours were spent on pretrial discovery between October 8, 1987 and May 16, 1991; 304.5 hours were spent on trial preparation between May 17, 1991 and November 13, 1991; and 832.7 hours were spent on trial between November 14, 1991 and January 2, 1992.
The Second Phase relates to time accrued from the conclusion of the trial to the end of the billing data submitted, during which time the two appeals were successfully prosecuted. This relates to the time span of January 3, 1992 until October 17, 1995, a period of more than 3 years, 9 months. In the Second Phase, plaintiff is seeking a total award of $465,165.00 in CT Page 8565 connection with 2, 136.8 total hours billed. John T. Scully performed 833.8 hours of the work (39 percent) and Joseph La Lella performed 759.9 hours (35 percent), for a combined total of 74 percent of the hours billed. Plaintiff seeks to be recompensed for the work of 24 other persons who billed hours during the Second Phase — including eight partners, one lawyer who was both an associate and a partner during this time period, one lawyer who worked as both an associate and a law clerk during this period, eight associates, four law clerks, and two paralegals. The time spent as reflected in the invoices is the rough equivalent of one person, working a 40 hour week, billing more than 53 weeks of work.
The invoices indicate that in addition to Attorney John F. Scully, Attorney James T. Scully and William J. Scully performed legal work on this case. As will be discussed, Mr. Mulligan is the brother-in-law of senior partner John F. Scully.
According to the summary of legal work performed by category which plaintiff has submitted, 279.0 hours were spent on post-verdict proceedings between January 3, 1992 and September 18, 1992; 1,092.4 hours were spent on the first appeal to the Connecticut Supreme Court; 237.1 hours were spent on post-verdict proceedings following reversal and remand by the Supreme Court; 425.9 hours were spent on the second appeal to the Appellate Court; and 102.1 hours were spent on entry of judgment and taxation of costs.
The record indicates that a contingency fee agreement is in effect between Mr. Mulligan and his lawyers providing that counsel shall be paid one-third of all sums recovered. Plaintiff's counsel have informed the court they have already been paid one-third of the $1,332,417 paid to him as a consequence of the verdict, for a total fee thus far of $444,139. They will also receive one-third of any amounts awarded by the court in connection with the pending motion for attorneys' fees pursuant to the fee agreement.
Hearing Testimony
At the April 26, 1996 hearing held in connection with this fee request, testimony was provided by a number of witnesses. What follows is a summary of testimony, not intended to be exhaustive. CT Page 8566
William R. Davis testified as an expert witness for plaintiff. Mr. Davis, a well-known and highly respected plaintiff's lawyer with over 40 years of experience in practice, testified that while he had never personally handled a Section 1983 cases he had had significant experience in cases involving the defense of immunity. He testified that he was familiar with the normal and customary fees charged by attorneys in the Hartford area. Based on a review of documents provided to him, he testified that he considered the Mulligan case to be a complicated case legally given the legal issues relating to qualified immunity, that the use of two lawyers at trial was required to properly represent Mr. Mulligan's interests at trial, and that the result obtained was favorable. Mr. Davis answered "yes" when asked if the case was "fairly unique" procedurally in light of the two appeals. Based on his review of the billing records, he testified that in light of the nature of the case and the fact that it had been going on for eight-and-a-half to nine years, the hours spent on the case were reasonable. He testified further that he believed the hourly rates reflected in plaintiff's motion for attorneys' fees — $300 per hour spent for attorneys with more than 20 years of legal experience, $250 per hour spent for lawyers with more than 10 years of legal experience, and $200 per hour for associates, and $75 per hour for law clerks and paralegals — were reasonable. He testified that the attorneys' fees claimed by Mr. Mulligan in excess of $740,000 were reasonable. On cross-examination, Mr. Davis testified that he had not read the plaintiff's Supreme Court or Appellate Court briefs and did not know what the hourly rate was for any of the lawyers whose time was reflected in the invoices.
John T. Scully testified. A 1980 graduate of the University of Connecticut School of law, he testified that his practice consisted mainly of plaintiff's personal injury cases, criminal work and workmen's compensation work. He testified that he had been handling plaintiffs cases for the past eight to nine years, and had recovered what was at the time the largest recovery ($715,415.00) for a non-death case in Rockville Superior Court. His testimony indicated that he had some experience in civil rights cases, having assisted his uncle, John F. Scully, in a trial in federal court, but had never previously tried a civil rights case to verdict. John T. Scully testified that the firm's senior partner, John F. Scully, was his uncle, and that John F. Scully was plaintiff Arthur Mulligan's brother-in-law by marriage. He testified that John F. Scully had been involved as CT Page 8567 lead counsel early on in the case, but John F. Scully's busy trial schedule prevented him from being available for trial, so Mr. Mulligan asked John T. Scully to take the case over to ensure a quicker hearing.
John T. Scully testified as to what had been done to prepare for trial, including review of the prosecutor's file and East Hartford police records, interviews with witnesses and witness preparation, and research and preparation of legal memoranda. He stated: "We basically did everything that we felt was necessary to properly represent Arthur Mulligan in a case in which he had been . . . very, very wrongly accused."
Mr. Scully testified that he considered the case to have been very complicated factually. During trial, 15 witnesses were called by the plaintiff and four by the defendants. He and Mr. La Bella split the examinations of the defendants' witnesses. Mr. Scully stated that he had examined nine of the plaintiff's witnesses and Mr. La Bella had examined six. Mr. Scully made both the opening and the closing arguments. Jury selection took approximately five days. The trial began in early December, 1991. The verdict was rendered on January 2, 1992, resulting in a verdict on all six counts, including the civil rights claim.
Work on the appeals required review of the 14 volumes of trial transcripts.
On cross-examination, Mr. Scully stated that prior to theMulligan argument, he had argued one case in the Connecticut Supreme Court. He acknowledged that his firm had not provided a schedule of hourly rates for the attorneys in the firm in response to defendants' request. This question, by Attorney Farley, was objected to by Mr. La Bella, who argued that it was irrelevant and sought proprietary information. On cross-examination, Mr. Scully also testified that he had never charged an hourly rate for plaintiff's work at his firm, and has no established rate for personal injury cases since most of the work he performs is on a contingency fee basis. He said he did not know what hourly rate his work had been billed at for general practice matters in 1986-1994. In 1995, and at the time of the hearing, he testified that his hourly rate was $200 for general practice matters.
John Droney, another experienced and respected member of the Bar, testified. A partner in the firm of Levy and Droney, he CT Page 8568 testified that he had been a member of the Connecticut Bar since 1973 with civil and criminal experience in state and federal courts. He testified that he worked "almost exclusively" on Section 1983 matters while he worked as an intern in the assistant attorney general's office, and had represented both plaintiffs and towns in Section 1983 matters.
Attorney Droney testified that he considered the case to have been factually and legally complex. He opined that it was "absolutely necessary" for plaintiff to have two principal lawyers in light of the formidable counsel who represented the defendant.
He testified that he considered the result at trial to have been "extraordinarily favorable" in light of the fact that a judge at pretrial had evaluated the case as having been worth $40,000.
He stated that he considered the time spent by counsel to have been "reasonably spent" and said the hourly rate sought by plaintiff was reasonable and consistent with what attorneys of similar ability and experience charge in the Hartford area. He called $740,000 a "reasonable attorneys' fee" in the case.
On cross-examination, Mr. Droney indicated that he did not know precisely how much time plaintiff's lawyers had spent responding to the motion for summary judgment, preparing for trial, on post-trial motions, and during remand to the trial court between the two appeals. Nor did he break down the work performed by tasks, having instead analyzed the work with respect to the phases of the case. He testified that he read through the bill three times trying to determine if the times charged were reasonable.
Mr. Droney testified that he believed a fee of between $200 to $300 per hour would be fair for senior partners such as Patrick Flaherty and the senior Mr. Scully. He testified that $150 for associates and $75 for law clerks and paralegals seemed fair to him, also. He also stated that he believed that somewhere between $625,000 and $750,000 would be a fair "total fee" for the case. In reaching this result, Mr. Droney said that the result achieved was the "most critical" factor of the twelve Johnson
factors he had considered. In substance, he also considered that the case represented eight-and-a-half to nine years of work on a very difficult case against competent counsel involving complex CT Page 8569 issues of fact and law; that there were novel and difficult questions relating to qualified immunity and collateral estoppel in the context of a Franks hearing; that plaintiff's counsel performed at a high level of skill against skilled and determined adversaries; and that a contingent fee, with attendant risks, was involved.
With the exception of John T. Scully's testimony that his current rate was $200, no evidence was offered as to what the specific fees were for any of the lawyers who billed time in the case. Little or no information was provided concerning the experience of most of the billing attorneys in civil rights cases.
The testimony of Mr. Davis and Mr. Droney that the matter was legally and factually complex and that the result was outstanding deserves to be credited. Having reviewed the full file and everything in it — including all submissions in the Appellate and Supreme Courts — the Court also concurs with their assessments that plaintiff's counsel performed excellent legal work in a factually and legally complex case and achieved an outstanding result. Plaintiff's written submissions — particularly the response to the motion for summary judgment, and the appellate briefs — are logically constructed, well-crafted, carefully reasoned and provide clear evidence of significant care and effort having been expended.
Having considered all of the relevant factors set out in the cases, the exceptional result achieved, the evidence produced at the hearing, including the experience and expertise of John T. Scully, and Joseph La Bella in civil rights cases, and all of the parties' arguments with the lodestar calculation in mind, I have concluded that an award of fees shall be permitted as follows with respect to hourly rates, prior to reductions for excessive, ambiguous, or duplicative billings.
I have concluded that use of historic rates for the First Phase of the case, and current rates for the Second Phase of the case, is appropriate given the protracted history of the litigation, the distinctly different nature of the work performed in each phase, and the experience levels of counsel.
Analysis And Breakdown of Hourly Rates and Time Spent[2]
First Phase — Hours Accrued Up To Conclusion of
CT Page 8570The Trial (5/27/87 — 1/2/92)
Rate Experience at TotalPerson Position Awarded End of Phase Hours Award
John T. Scully Partner $140 11.3 years 209.1 500.7 ----- 709.8 $ 99,372
Joseph La Bella Associate $110 5.3 years 546.3 $ 60,093 James T. Scully Associate $110 4.3 years 73.7 $ 8,107 William J. Scully Associate $110 4.3 years 36.7 $ 4,037 John F. Scully Partner $175 37.3 years 15.0 $ 2,625 Sharon M. Hartley Associate $110 2.3 years 9.3 $ 1,023 Robb J. Canning Law Clerk $ 50 — — — — 17.0 $ 850 Eileen M. Flaherty Associate $110 2.3 years 6.7 $ 737 Rodd J. Mantell Associate $110 1.3 years 5.2 $ 572 Patrick J. Flaherty Partner $175 33.3 years 1.0 $ 175 Alice R. Weiner Paralegal $ 50 — — — — 1.4 $ 70 William F. Fechteler Paralegal $ 50 — — — — .7 $ 35 William R. Stuart Law Clerk $ 50 — — — — .5 $ 25 David T. Murray Paralegal $ 50 — — — — .3 $ 15 ------ -------- TOTAL 1423.6 $177,736
Second Phase-Hours Accrued From The Conclusion of The TrialTo The End of The Billing Data Submitted (1/3/92-10/17/95)
Experience at Total Person Position Rate End of Phase Hours Awarded
John T. Scully Partner 165 15.1 years 833.8 $137,577 Joseph La Bella Partner/ 140 9.1 years 759.9 Associate 163.7 ----- 923.6 $129,304
Patrick J. Partner $220 37.1 years 123.2 $ 27,104 Flaherty Robb J. Canning Associate/ $130 2.1 years 70.2 $ 9,126 Law Clerk 65 7.8 $ 507 Louis B. Partner $220 25.1 years 21.4 $ 4,708 Blumenfeld Karen J. Casey Partner $160 14.1 years 21.2 $ 3,392 CT Page 8571 Lorinda S. Coon Associate $130 11.1 years 33.5 $ 4,355 William J. Scully Partner $130 8.1 years 31.0 $ 4,030 Anthony J. Pantuso Associate $130 3.1 years 25.9 $ 3,367 Eileen M. Flaherty Associate $130 6.1 years 23.1 $ 3,003 Eugene A. Cooney Partner $200 18.1 years 4.5 $ 900 Richard A. Ferris Partner $160 14.1 years 1.4 $ 224 John W. Sitarz Partner $220 23.1 years 1.1 $ 242 Joseph J. Green Law Clerk $ 65 — — — — 3.4 $ 221 Daniel J. Associate $130 5.1 years 1.4 $ 182 Guariglia Arthur J. Hudon Associate $130 3.1 years 1.2 $ 156 James T. Scully Partner/ $130 8.1 years .6 Associate .3 ---- .9 $ 117
M. Catherine Healy Law Clerk $ 65 — — — — 2.1 $ 137 Matthew J. Scott Associate $130 2.1 years .7 $ 91 William M. Paralegal $ 65 — — — — 1.4 $ 91 Fechteler Monika N. Lahiri Law Clerk $ 65 — — — — 1.3 $ 85 Raymond W. Mensack Law Clerk $ 65 — — — — 1.1 $ 72 Jeffrey V. Phelon Associate $130 9.1 years .4 $ 52 Elizabeth F. Flynn Associate $130 7.1 years .4 $ 52 Eileen A. O'Connor Paralegal $ 65 — — — — .7 $ 46 Jeffrey C. Partner $220 20.1 years .1 $ 22 Pingpank ----
TOTAL HOURS: 2136.8
TOTAL AWARDED: $329,163.00
Discussion — Analysis of Time Spent and Reductions
A general review of the hours claimed for the First Phase discloses numerous individual instances of excessive or duplicative requests or requests for which an ambiguous explanation is provided, many relatively innocuous. For example, a claim is made for the attendance at the deposition of Gerald Myers on May 9, June 3, and June 20, 1988, billing 20.9 hours. While attendance at this deposition may have been helpful, it was not necessary. Then 1.6 hours more are claimed for "receipt and review of transcript" on August 17 and 19, 1988. As a consequence, 22.5 hours are claimed in connection with this one deposition. In entries of August 26, 28, 29 and 30, 1988, time is CT Page 8572 billed for 5 hours "for travel to Meriden to obtain and review Attorney Axelrod's file," for a total of 10 hours. A November 26, 1991 entry sought 2.3 hours for "Research re: prosecutors and judges." Such a general description, lacking more detail, makes it difficult to analyze what work was actually performed. A January 31, 1992 entry claimed an undesignated portion of 4.90 hours for "continue review Hennessey cases . . ." To be sure, it may be outstanding advocacy to research a judge's written opinions, but it is not reasonable to expect a client or an adversary to pay fully for this. On February 11 and 12, 1992, a claim is made for a total of 9.1 hours to "Review and organize file re post-verdict and appeal prep."
Viewing the hours spent in the First Phase from a broader perspective by task also leads to the conclusion that the hours must be diminished for purposes of determining a fair award given the facts of this case and the legal principles involved. As defendant points out in its May 10, 1996 Memorandum in Opposition, plaintiff has requested 86.20 hours as billed by three people in connection with its response to the defendant's motion for summary judgment; 404.70 hours in connection with work performed by five persons for trial preparation prior to the commencement of trial; 192 hours as expended by three persons for trial preparation during trial; and 238.80 hours as spent by seven persons for research during trial.
The time devoted by plaintiff's counsel may have been well spent in the sense that counsel went to exceptional efforts to research the written pleadings, which are of uniformly high quality, and prepare prior to and during trial. Unquestionably, counsel were motivated by a strong sense that Mr. Mulligan had suffered a grievous wrong. The attorneys representing Mr. Mulligan would also have been less than human had they not been influenced to be unsparing with their time in light of the fact that Mr. Mulligan was a close relation to a senior partner in the firm. It is not reasonable, in the court's view, to expect defendant to pay all of the time claimed notwithstanding the excellent result obtained. The Court fully shares the view of Mr. Davis and Mr. Droney that use of two principal counsel was appropriate — indeed necessary — given the factual and legal challenges posed by this case. However, some portion of the time expended was, of necessity, duplicative, involving not two but numerous attorneys, law clerks and paralegals collaborating on single tasks. As the case law makes clear, compensation must be reasonable under all the circumstances. CT Page 8573 Consequently, based on my detailed review of the entire record and of the invoices, and in light of the case law, I conclude that the time spent in the First Phase should be diminished by 15 percent, producing a fee award of $151,075.60 for the First Phase.
Review of the time billed in the Second Phase likewise indicates that plaintiff's counsel seeks attorneys' fees for more time than is reasonable. By his own reckoning, plaintiff's counsel spent a total of 1,092.4 hours for all proceedings in connection with the first appeal. By any fair measure, given the facts and circumstances of this case, that number of hours is excessive.
Minor excesses, sometimes innocuous, also appear in the Second Phase. Entries of April 19 and April 22, 1993 indicate that 22 hours of time is billed for receipt and review of briefs from various attorneys on the issue of qualified immunity, and that 1.60 hours is billed on May 10, 1993, for "Letters to various attorneys who sent briefs thanking them;" that 2.0 hours are claimed on September 24, 1993, for "Attendance at Supreme Court . . ." apparently to view other arguments; and that, in connection with the attendance at three mock arguments prior to the actual argument of the case in the Connecticut Supreme Court, between February 8, 1994 and February 15, 1994, various persons billed in excess of 35 hours. According to defendant's calculations, as contained in its defendant's May 10, 1996 supplemental memorandum, plaintiff is claiming 532 hours for work performed by nine persons in connection with researching and preparing the opening brief on the Supreme Court appeal; 170 hours for work performed by eight persons in connection with research and preparation of the reply brief on the Supreme Court appeal; 208 hours in connection with the work performed by six persons relating to hours expended on oral argument of the Supreme Court appeal, including mock arguments and practice moot court sessions; and 222.50 hours for the work performed by seven persons in connection with proceedings on remand from the Supreme Court; 56.60 hours for work performed by five persons in connection with research and preparation of the second appeal; 165.10 hours in connection with work performed by five persons researching and preparing opening briefs on the second appeal; 71.80 hours in connection with work performed by four persons in connection with research and preparation of the reply brief on the five persons expended on the oral argument of the second appeal. CT Page 8574
In its August 23, 1996, supplemental memorandum, filed at the Court's request, plaintiff provides a breakdown indicating he is seeking attorneys' fees for 158.4 hours of work in connection with plaintiff's Brief in Opposition to Amended Motion to Set Aside Verdict and for Judgment Notwithstanding the Verdict dated April 29, 1992; for 43.7 hours for work performed by 4 lawyers in connection with Motion for Attorneys' Fees dated October 27, 1995; 112.8 hours in connection with appellate practice preparation prior to the first appeal; and 68.3 hours in connection with preparation for and three practice arguments. Most significant, he seeks fees for 420.6 hours of work performed by eight persons on the Supreme Court brief, and 152.1 hours for work performed by numerous persons on the reply brief.
Just as plaintiff overstates its request, defendant overstates its case in requesting that the hours be slashed by between 40 and 85 percent, and by claiming that as much as 1,505.70 hours of entries are vague and ambiguous. While plaintiff's request is clearly excessive in some respects — particularly with respect to the time spent on the first appeal — a significant portion of the legal work performed by plaintiff was necessitated by the aggressive and able defense mounted in this case by skilled defense lawyers who raised every legitimate argument at their disposal at every turn. To an appreciable degree, the aggressive defense asserted by defendants, against whom the jury ultimately returned a substantial verdict, necessitated the expenditure of a good deal more time, energy, and effort than the average case. Moreover, while some of the entries cited by defendant are arguably ambiguous, in the overwhelming number of instances, the degree of detail provided is sufficient to permit the entries to be meaningfully analyzed. In fairness to plaintiff, the significant numbers of hours billed must not be viewed in a vacuum illuminated by 20-20 hindsight, but in the context of the serious and meritorious claims he asserted and of the genuine legal and procedural challenges of the case.
Still, that there is significant duplication of effort and an extraordinary expenditure of time in the Second Phase is undeniable. Moreover, some, although by no means all, of the legal issues raised in the first appeal were an outgrowth of and extension of issues raised, analyzed, and briefed in earlier phases of the case. Additionally, Attorneys John T. Scully and Joseph La Bella performed a less substantial percentage of the CT Page 8575 work than they did in the First Phase, while many more persons billed time during the Second Phase. Having reviewed the full record, and in consideration of all of the above, I conclude that the fees sought by plaintiff's counsel in connection with the Second Phase must be diminished by 30 percent, producing a fee award of $230,414.10 for the Second Phase.
* * * * * * * * * *
Summary and Conclusion
Diminishing the hourly rates allowed by 15 percent with respect to work performed in the First Phase, and 30 percent with respect to work performed in the Second Phase, results in a total attorneys' fee award of $381,489.70. The Court rejects plaintiff's request for hourly rates to be increased with regard to interest rates. To do so would produce a windfall.
In my view, a fee of this significant amount is reasonable, and does not represent a windfall, in light of the somewhat unusual facts and circumstances presented in this case, the important goals served by awards of attorneys' fees in Section 1983 cases such as this, and the lengthy proceedings which Mr. Mulligan has endured.
Douglas S. Lavine Judge, Superior Court